Robin OYEN, SSN 319–48–3986, Plaintiff,

v.

Donna SHALALA, Secretary of Health and Human Services, Defendant.

No. 94 C 6.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 11, 1994.

As Amended Nov. 16, 1994.

Frederick J. Daley, Chicago, IL, for plaintiff.

James G. Hoofnagle, Jr., Chicago, IL, for defendant.

### MEMORANDUM OPINION
### AND ORDER

SHADUR, Senior District Judge.

Robin Oyen ("Oyen") appeals the final decision of Department of Health and Human

Services ("HHS") Secretary Donna Shalala ("Secretary") denying Oyen's claim for supplemental security income ("SSI") and disability insurance benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1382 and 1382(c).[1] As is usual in these cases, both Oyen and Secretary have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56,[2] with Oyen alternatively moving for the remand of Secretary's determination. For the reasons stated in this memorandum opinion and order, Oyen's motion for remand is granted (so that her motion for summary judgment is denied, and Secretary's cross-motion is of course denied as well).

### Facts

Oyen, a 39–year–old high school graduate who has also completed a six-week course in airline ticketing and reservations (R. 43), claims that as a result of a broken vertebra suffered in a May 15, 1991 motorcycle accident she became disabled until April 1993. At that point she resumed the US Air baggage handling job that she had held before the accident, so that her claim is limited to a period of just under two years.

### Oyen's Hearing Representative

Oyen attended the Hearing before ALJ Greene without legal counsel but accompanied by a friend, Alice Byrne ("Byrne"). After a bit of discussion between Oyen and Byrne they agreed that Byrne would be Oyen's representative at the Hearing (R. 36). ALJ Greene then questioned Byrne as to her "experience with Social Security matters," to which Byrne responded (1) that she had "experience with recipients" of Social Security Disability Insurance and (2) that as to Social Security law and regulations she had not taken any formal classes but had looked at library books (R. 36–37). That led to this exchange (R. 37):

ALJ: Okay. All I, all I'm trying to do, ma'am, is to show that you're qualified to represent the claimant.

Representative: If she thinks I'm qualified then that's—I feel—

ALJ: Okay. You, do you feel your representative is qualified, ma'am?

Claimant: Yes.

ALJ: Okay. I'll go on with your wishes then and I'll allow your representative to proceed in your behalf.

### Oyen's Testimony [3]

On May 21, 1991 Oyen's broken vertebra was operated on, involving a bone graft from her hip and the insertion of metal rods (including metal screws) in her back (R. 60, 61, 134). For three months afterwards she wore a brace over her torso (R. 60). After the brace was removed, in an effort to improve sufficiently to return to her prior job as a baggage handler (R. 45–46) she went to a work hardening program until March or April 1992, when she broke a toe (R. 60, 62, 67, 73). Once that injury was healed she did not resume the program because she was "scared to go back" due to a $6,000 outstanding bill that her insurance had not paid and that she did not know how to pay (R. 67).

Oyen's treating physician Dr. Paul Meyer told her to swim to aid the recovery process, so for 12 hours a week (about an hour at a time) Oyen would go to a pool and "mostly hold on to the side and just paddle my legs" (R. 64, 73–74). Though Oyen had felt pain in her back ever since the accident, some time after May 1992 she noticed a "different" pain in the small of her back (R. 68–70, 73). X-rays taken on August 26, 1992 disclosed that two screws in her back had broken. That necessitated additional surgery to remove the screws, a procedure that had not been performed as of the date of the Hearing (R. 61, 72, 249).

1. Further citations to the Act's provisions will simply take the form "Section—," using the Title 42 numbering rather than the Act's internal numbering. Pertinent regulations from 20 C.F.R. will be cited "Reg. § —."

2. On the current cross-motions the entire factual input is provided by the Administrative Record, including the transcript of Oyen's October 16, 1992 hearing (the "Hearing") before Administra-

tive Law Judge ("ALJ") Dennis Greene. All record citations will take the form "R.—" (the Hearing transcript occupies R. 32–99, while ALJ Greene's decision is at R. 21–26).

3. Although this section omits the constant repetition of "Oyen testified," everything set out in the text should be understood in those terms.

Oyen did not know if the cause of her ongoing back pain was that she knew of the broken screws or "because I saw the x-rays" (R. 68). When she leans back in a hard back chair it feels "like something stabs me," causing a "very, very severe" pain (R. 68, 69). If she is standing "it feels like somebody's got strings pulling me down in the back," causing a sensation of "a lot of pressure" (R. 69). Her "back would hurt bad" whenever she sat, stood or walked "in excess" (R. 75). Oyen's pain limits her ability to bend, but she can squat to pick things up. Her pain causes no other problems, and the only medication she takes for it is "aspirin or an Advil" or Tylenol, but "not even once a week," which is no more than she took such medication before her accident (R. 71, 76).

Oyen can "probably walk for maybe two hours if I could sit for like a few minutes in between" and can also sit for "I'd say two hours. But I'm constantly like switching, switching sides" (R. 66). She did not know if she could work an entire eight-hour day even if able to sit and stand alternately, but she had gotten up to "four or five" hours at her work hardening program (R. 66–67). She could lift "without a problem maybe 10, 15 pounds," but could not do so over her head with the broken screws in her back (R. 66).

Oyen intended to return to her prior job with US Air once the broken screws were removed from her back and she had time to recuperate (R. 72). After she said that, ALJ Greene asked Oyen whether she could handle a job, if "today" US Air offered one, where "you don't have to lift any baggage, at most you might have to lift 20 pounds once in a while, you know, maybe you might have to lift 10 pounds at a more frequent level ... and you would be standing maybe 6 out of 8 hours a day" (R. 74). Oyen responded "I believe I could" (*id.*). But she then said she did not know if she could stand for six hours because of her back pain (R. 74–75). And later she testified that because of her back pain she could not return to her US Air job (R. 80)—a job that involved lifting 20 to 40 pounds frequently and 50 pounds occasionally, and standing most of the day (R. 46–48).

*Testimony of the Vocational Expert ("VE")*

VE Thomas Dunleavy ("Dunleavy") also testified at the Hearing (R. 83–91). ALJ Greene first posed a hypothetical question as to what jobs could be performed by a person with Oyen's age, education and work history who was able to do a full range of light work, but with only occasional stooping, kneeling, crouching and crawling (R. 86–87). Dunleavy responded that these are the relevant unskilled jobs in the "six county area of Chicago" (R. 87):

1. 8 to 10 thousand as assemblers in manufacturing,

2. 8 to 10 thousand in packing operations,

3. 10 to 15 thousand as cashiers and

4. 200 as reservation agents.

When next presented with the same hypothetical except for assuming a sedentary rather than a light work level (R. 87), the VE listed these relevant unskilled jobs (R. 88):

1. 6 to 7 thousand as assemblers,

2. 4 to 5 thousand as packagers,

3. 8 thousand as cashiers and

4. 6 to 7 thousand in customer service, sitting at a desk and answering questions.

If a sit-stand option were required, with the hypothetical person not having to change position more often than every 20 minutes, VE Dunleavy said that the same jobs other than those in customer service would still be available (R. 88–89).

Finally, the VE was asked how his testimony would be affected if he were to credit Oyen's testimony as to her pain and functional limitations (R. 89). On that score VE Dunleavy's testimony was somewhat fuzzy. First he focused on Oyen's need for additional surgery to remove the broken screws and stated that "if a person is medically unstable that would have vocational impact," (*id.*) "possibly interfer[ing] with her ability to work" (R. 90). Then on further questioning by the ALJ, the VE said that "[i]f a person could perform a job on a short, short basis but in fact was considered by [sic] for whatever reasons to be medically unstable, ... then I would certainly not [be] too inclined to assist a person in finding a job" (R. 90).

*Medical Evidence at Hearing*[4]

After her surgery Oyen was under the care of Dr. Meyer, whose August 21, 1991 examination noted that the incision in her back "does not cause her discomfort," that she suffers from "No Pain" (R. 220), that "Spine fracture healed[,] Hardware intact" (R. 185), but that she was (R. 184):

> Restricted from heavy lifting. Has not yet been medically released to work yet.

Just over a month later (on September 25, 1991) another examination by Dr. Meyer disclosed "satisfactory spinal healing and alignment with solid internal fixation" (R. 214). "Because a light duty position is not available" at US Air, Dr. Meyer then "recommended that she remain off work for an additional eight weeks" (*id.*). On December 2, 1991 Dr. Meyer observed that Oyen's x-rays continued to disclose "intact internal fixation" (R. 212), and he referred her to a work hardening program at STEPS Industrial Rehabilitation Clinic ("STEPS") (*id.,* R. 207) so that she would be able to meet the physical demands of her baggage handler job.

STEPS' March 20, 1992 progress note (R. 200) said that Oyen "is tolerating up to 4 hours of work hardening daily," rated her pain at a level 5 or "moderate" ("she rates ... her back pain as better, (foot pain is worse)") and predicted that after two more weeks of the program she would be able to tolerate a full eight-hour day at the "medium work level" required by her prior job (*id.*).[5] But the note went on to say that a possible hairline fracture in her left foot "has prevented client from participating fully in the program over the past week" (R. 200). One month later (on April 20, 1992) STEPS reported (R. 236) that Oyen had been "on hold from participating in the program" since March 20 due to a metatarsal fracture, so that the March 20 progress note only "indi-

cates her level of work tolerated prior to her foot injury." Oyen was then discharged from the program because of that foot injury (R. 236).

On March 23, 1992 Dr. Meyer had opined that Oyen's fracture had "healed" with "Spinal Fusion—stable," that she was "full weight bearing" but could do "No heavy lifting" (R. 196–97). In handwritten notes of the same date Dr. Meyer noted that Oyen "is now operating @ a Light–Med level of activity for 4 [hours]/day" (R. 199). On June 23, 1992 Dr. Meyer's office attempted to reach Oyen to explain her need "to follow up with Dr. Meyer as part of her continued postoperative care" (R. 238). Then during an August 26, 1992 examination at which Oyen complained of "back pain" (R. 239), Dr. Meyer determined that two of the screws inserted in her back had broken and needed to be removed (R. 239, 251).

*Dr. Meyer's Post–Hearing Evidence*

Before receiving the VE's testimony at the Hearing, ALJ Greene said that based on Oyen's testimony and Dr. Meyer's September 25, 1991 examination "it sounds like as of that point in time she could perform light work" and that, coupled with Oyen's age, such a condition called for a finding of "not disabled" under Secretary's regulations ("the grid") (R. 78). However, "to give [Oyen] every chance" (*id.*) and "every option and every favorable way of interpreting the medical evidence" (R. 81), ALJ Greene said he wanted Byrne as Oyen's representative to get Dr. Meyer to submit a "longitudinal RFC" giving both a diagnosis and a prognosis of Oyen (R. 93). After the hearing ALJ Greene apparently supplied Oyen and Byrne with an RFC form to be sent to Dr. Meyer together with a return envelope addressed to ALJ Greene, leaving the record open for 30 days to receive that information (R. 98).

---

**4.** One of the exhibits in the record is a "Residual Physical Functional Capacity ['RFC'] Assessment" form completed by consulting physician Dr. George Kudirka on October 15, 1991 (R. 188–95). But because ALJ Greene made no reference to that evaluation in concluding that Oyen was not entitled to benefits, this opinion omits the contents of that form as irrelevant to the review of Secretary's decision.

**5.** However, a February 19, 1992 STEPS report (more than four weeks earlier) had anticipated that Oyen would achieve that functional level "in the next 4 weeks" (R. 202). So much for the ability to predict these matters with any degree of precision.

In response to that request, Dr. Meyer sent a November 23, 1992 letter (R. 254–55) briefly outlining Oyen's medical history. In part he related that at his August 26, 1992 examination of Oyen "[h]er only complaint was that of discomfort over the site" of her spinal surgery, that x-rays had revealed "the spinal fusion itself was intact" but that "a screw used with the internal fixation device" had fractured, and that he had "recommended that the instrumentation be surgically removed if Ms. Oyen became symptomatic" (R. 254). He then went on to state (*id.*):

Ms. Oyen is capable of returning to some type of gainful employment with some restrictions. She was capable of some light duty type of work in December of 1991. The reason she was not returned to work at that time was because she felt she wanted to return to her former job and that would require some work hardening. Ms. Oyen was in therapy for approximately four months and then was terminated.

In the RFC assessment form attached to the letter (R. 257–64), Dr. Meyer checked boxes reflecting that Oyen can lift up to 50 pounds occasionally and up to 25 pounds frequently,[6] can stand and walk for at least two hours in an eight-hour day, can "sit (with normal breaks)" for less than six hours in an eight-hour day and has an unlimited capacity to push and pull with hands and feet (R. 258). Dr. Meyer wrote that those conclusions were "[b]ased on history of spine fracture" (*id.*). He also checked boxes stating that Oyen can kneel frequently, can balance, stoop, crouch and crawl occasionally and can never climb (R. 259). Dr. Meyer noted only one other limitation: Oyen was to avoid concentrated exposure to vibration (R. 261).

On December 1, 1992 ALJ Greene sent this letter addressed to Byrne and listing Oyen's address (R. 265):

Subsequent to the hearing, I have obtained some additional evidence which you have not had the opportunity to examine. Copies of this evidence are enclosed for your review.

Please study the additional documentation and submit in writing to me any objections you may have. If I do not hear from you by December 11, 1992, the new material will be entered as evidence, and I will begin working on a decision in this case.

Byrne appears to have disappeared from the case, because Oyen wrote her own response. Her comments on Dr. Meyer's cover letter simply reiterated that it was not one screw but two that were broken, that the reason for discontinuing therapy was her unpaid bill of $6,000 and that "I didn't know how I was going to pay this alone running up more of a bill" (Ex. 34 at 2 [7]). As for Dr. Meyer's conclusions as to Oyen's exertional abilities, she disagreed with their basis (Ex. 34 at 2–3):

This is based on history of spine fracture, not including 2 broken screws. I have a painful clicking in my back every time I move.

Later in December 1992 Oyen wrote ALJ Greene that her insurance carrier had finally approved the performance of surgery by Dr. Meyer to remove the screws and that surgery was scheduled for January 21, 1993 (Ex. 35; see also P. Mem. 18). As indicated at the outset of this *Facts* section, that led to Oyen's return to her former job in April 1993.

*Other Evidence*

On September 3, 1991 Oyen filled out a "Disability Report" as part of her request for Social Security benefits. There she stated that she was able to lift up to 15 pounds, cook, wash dishes, go shopping daily, do "lite" housework and laundry, go fishing and swimming, and she also stated that her back brace was removed on August 23, 1991 and

---

6. "Frequently" means between one-third and two-thirds of an eight-hour day (cumulative, not continuous), while "occasionally" means from very little to one-third of an eight-hour day (R. 257).

7. That letter and another exhibit (respectively numbered Exs. 34 and 35 in the administrative record) were not contained in the record submitted to this Court. In response to this Court's request, Oyen's counsel furnished Oyen's retained copy of Ex. 34 sent to ALJ Greene. Oyen says that the only difference between the two "is neatness" (P. 9/27/94 Letter).

she was able to drive five days later (R. 135, 137).

### Statutory and Regulatory Framework

Under Section 423(a)(1) a person is eligible for disability benefits if he or she:

(A) is insured for disability insurance benefits ...,[8]

(B) has not attained retirement age ...,

(C) has filed application for disability insurance benefits, and

(D) is under a disability....

SSI eligibility under Section 1382(a) is extended to "aged, blind and disabled individual[s]" who do not have an eligible spouse and who do not have yearly income or "resources" above set amounts. "Disability" is defined in the same way for both types of claimed benefits: the inability (Sections 423(d)(1)(A) and 1382c(a)(3)(A)):

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted ... for a continuous period of not less than 12 months....

*Young v. Secretary of HHS*, 957 F.2d 386, 389 (7th Cir.1992) (citations omitted) is one of the many cases explaining the five-step process that guides Secretary's sequential evaluation of a disability claim:

When considering whether a claimant is eligible for benefits, the Secretary uses a five-step inquiry: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. A negative conclusion at any step (except for step three) precludes a finding of disability. An

affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability. 20 C.F.R. § 404.1520 (1991).

In that process (*Herron v. Shalala,* 19 F.3d 329, 333 n. 8 (7th Cir.1994)):

If a claimant reaches Step 5, the Secretary has the burden of proving that there are jobs in the national economy that the claimant can perform.

At that step, Secretary's assessment involves a determination of the claimant's RFC, defined in Social Security Ruling ("SSR") 83–10 as a:

medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).

RFC is expressed in terms of a claimant's maximum sustained work capacity for either "sedentary," "light," "medium," "heavy" or "very heavy" work as those terms are defined in Reg. §§ 404.1567 and 416.967. If a claimant is found unable to perform his or her past relevant work, Secretary then goes on to determine if there is "any other work" the claimant can do—jobs that "exist in significant numbers in the national economy"—considering his or her RFC together with his or her "vocational factors of age, education, and work experience" (Reg. §§ 404.1560 and .1561, 416.960 and .961). To facilitate that process Secretary has promulgated the Grid, which supplies for each RFC category conclusive determinations for the various possible combinations of RFCs and vocational factors.

### Evaluation of Pain Allegations

Secretary has notified claimants that in every RFC assessment she "will consider the impact of your impairment(s) and any related symptoms, including pain" (Reg. §§ 404.1529(d)(4), 416.929(d)(4)). "[S]tatements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work" will not be rejected by Secretary

---

8. ALJ Greene found that Oyen was so insured through December 31, 1995 (R. 21).

"solely because the available objective medical evidence does not substantiate your statements" concerning pain (Reg. §§ 404.1529(c)(2), 416.929(c)(2)).

Secretary has issued SSR 88–13 "to provide guidance" for the consideration of pain and other subjective symptoms in disability determinations. That ruling recognizes that pain can impose "a greater restriction of [a claimant's] ability to function than can be demonstrated by objective medical evidence alone." Accordingly SSR 88–13, echoing Reg. § 404.1529(c)(3) and 416.929(c)(3), cites examples of evidence relevant to a proper assessment of the effects of pain:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4. Treatment, other than medication, for relief of pain;

5. Functional restrictions; and

6. The claimant's daily activities.

Additionally, SSR 88–13 has responded to the unfortunate practice of some ALJs to "play doctor" by emphasizing that an ALJ "is not free to accept or reject that individual's subjective complaints solely on the basis of ... personal observations" of the claimant. Instead an ALJ, having considered (1) the objective medical and nonmedical evidence, (2) the claimant's subjective allegations of pain and (3) the ALJ's personal observations, must both resolve any inconsistencies and explain the claimant's "capacity to work" logically. If after that complete assessment the claimant is found able to perform any work in the national economy, the claimant is by definition "not disabled" (Reg. §§ 404.1520(f)(1), 416.920(f)(1)).

9. On June 30, 1993 HHS issued a new HALLEX publication that uses exactly the same language

### Claimant's Representative

While a claimant naturally has the right to proceed pro se in his or her dealings with Secretary (see, e.g., *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir.1994)), the Act provides that he or she may elect to be represented by either an attorney or a non-attorney (Section 406(a)(1)). In that respect Reg. §§ 404.1705(b) and 416.1505(b) state:

You may appoint any person who is not an attorney to be your representative in dealings with us if he or she—

(1) Is generally known to have a good character and reputation;

(2) Is capable of giving valuable help to you in connection with your claim;

(3) Is not disqualified or suspended from acting as a representative in dealings with us; and

(4) Is not prohibited by any law from acting as a representative.

### ALJ's Duties as to Evidence

At a hearing before an ALJ a claimant of course has the right to present evidence supporting the claim for benefits (Reg. §§ 404.950(a) and 416.1450(a)). And ALJs will routinely leave the administrative record open for 30 days after the date of a hearing for the submission of additional evidence (see, e.g., *Jozefick v. Shalala*, 854 F.Supp. 342, 345 (M.D.Pa.1994)).

However, any post-hearing evidence requires special treatment. It should be remembered that whenever a claimant requests a hearing to appeal Secretary's initial denial of benefits, Section 405(b)(1) directs that Secretary "shall on the basis of evidence adduced at the hearing, affirm, modify, or reverse his findings of fact and such decision." Hence where such additional evidence is submitted to the ALJ *post*-hearing, and where the record does not reflect that "the claimant has knowingly waived his or her right to examine the evidence" or that "the ALJ proposes to issue a fully favorable decision" (HHS, *Hearing, Appeals, Litigation, and Law Manual, HALLEX* ch. I–2–730 A (Oct. 30, 1990)) [9] the ALJ "must proffer" that

as that in effect as of the Hearing date.

evidence by way of a letter that must in turn (*HALLEX* ch. I–2–730 B):

1. give the claimant a time limit to object to, comment on, or refute the evidence, or exercise his or her rights with respect to requesting a supplemental hearing and the opportunity to cross-examine the author(s) of any posthearing report(s); and

2. if the ALJ is proposing to enter medical reports into the record as exhibits, also inform the claimant of the right to:

a. submit the new evidence to a treating source(s); and

b. submit any comments from the treating source(s) to the ALJ for inclusion in the record.

### Procedural History and Administrative Findings

On September 3, 1991 Oyen filed for SSI and disability insurance benefits (R. 100–06). HHS personnel denied her application both initially (R. 109–16) and then upon reconsideration (R. 122–27), after determining that she would not be disabled for 12 continuous months and could perform work that was less demanding than her past job.

After the Hearing requested by Oyen (R. 13), on February 19, 1993 ALJ Greene denied her application, finding that (1) her condition did not meet or equal any listed impairment (step 3), (2) there were a significant number of jobs that she could perform in the Chicago Metropolitan area and (3) given her RFC and age, the Grid directs a non-disabled finding at all times relevant to her claims (step 5), all of that rendering her ineligible for SSI or disability insurance benefits. ALJ Greene's opinion included these findings (R. 26):

3. The claimant was not an entirely credible witness. The records of Dr. Meyer, her treating orthopedic surgeon, do not corroborate her subjective complaints of pain and functional limitation. Furthermore, the claimant's own reported activities and inconsistent testimony regarding whether she can in fact do light work, or not, also support my finding that the claimant is not an entirely credible witness.

4. The claimant retains the residual functional capacity for a significant range of light and sedentary work as identified by the vocational expert.

5. The claimant is incapable of performing her past medium or heavy jobs.

6. The claimant is 37 years old which is defined as a "younger person" and she has a 12th grade education.

\* \* \* \* \* \*

8. Sections 404.1569 and 416.969 of Regulations No. 4 and No. 16 and Rules 202.20, Table No. 2 and 201.27, Table No. 1, used as a framework, direct that the claimant, considering her maximum sustained work capability, age, education, and work experience be found not disabled.

9. Claimant has not been under a disability at any time pertinent to this decision (20 C.F.R. 404.1520(f) and 416.920(f)).

On October 23, 1993 the Appeals Council denied review of ALJ Greene's decision (R. 5–6). That decision thus became Secretary's final decision.

### Standards of Review

■ Section 405(g) empowers this Court to affirm, modify or reverse the Secretary's decision with or without remand for rehearing. When that review concerns the proper application of the governing statute and regulations, it presents a question of law that is reviewed de novo (*Dotson v. Shalala*, 1 F.3d 571, 575 (7th Cir.1993)).

■ By contrast, Section 405(g) itself provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Under that standard many cases, including the recent *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir.1994), teach:

We will not reevaluate the facts, reweigh the evidence, or substitute our own judgment for that of the Secretary.

"Substantial evidence" means (*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)):

more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

"Substantial evidence may be something less than the greater weight or preponderance of the evidence" (*Young,* 957 F.2d at 389), and a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion (*Delgado v. Bowen,* 782 F.2d 79, 83 (7th Cir.1986) (per curiam)).

■ Every ALJ has a duty to explain the basis of his or her decision with particularity. To quote once again from *Young,* 957 F.2d at 393, "within reasonable limits, the reason for rejecting evidence must be articulated if there is to be meaningful appellate review." Although those words would appear to imply a rigorous level of review, the phrase "reasonable limits" has been given expansive meaning. Thus *Pope v. Shalala,* 998 F.2d 473, 481 (7th Cir.1993), quotes *Steward v. Bowen,* 858 F.2d 1295, 1298 (7th Cir.1988) to reconfirm that an ALJ need only:

> minimally articulate his or her justification for rejecting or accepting specific evidence of disability.... But he or she need not provide a written evaluation of every piece of evidence that is presented.

What is ultimately required of an ALJ is this (*Stein v. Sullivan,* 966 F.2d 317, 319 (7th Cir.1992), quoting *Brown v. Bowen,* 847 F.2d 342, 346 (7th Cir.1988)):

> It is enough if the ALJ indicates the path of decision.... The administrative tribunal need not spell out every step in the reasoning, if it provides enough steps that the full course may be discerned.

Oyen contends that reversal or remand is in order because ALJ Greene:

1. failed to inform Oyen adequately as to her statutory right to counsel,

2. failed to determine whether Byrne was qualified to be a non-attorney representative (and in fact she was not so qualified),

3. neglected to inform Oyen of her right to cross-examine Dr. Meyer as to his RFC report,

4. relied improperly on Dr. Meyer's RFC report,

5. relied improperly on VE Dunleavy's testimony and

6. failed properly to consider evidence of Oyen's pain.

Each of those contentions will be addressed in turn.

### Proper Representation

■ Because a claimant has a statutory right to counsel, waiver of that right must be knowing and intelligently made, for which purpose a claimant must be "adequately informed" either "in prehearing notice or at the hearing" (*Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir.1991), citing *Smith v. Schweiker,* 677 F.2d 826, 828–29 (11th Cir. 1982)). And *Binion,* 13 F.3d at 245, citing *Thompson,* 933 F.2d at 584, teaches:

> To ensure a valid waiver of counsel, we require the ALJ to explain to the *pro se* claimant (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees.

■ It is true that Oyen came to the Hearing not by herself but accompanied by her friend Byrne. But in the course of the initial colloquy (R. 34–36) it quickly became plain that Byrne was unclear as to the distinction between a "representative" and a "witness" (R. 35), that she wanted to know whether, if she declared herself as neither, "if it's appropriate can I still speak up if necessary?" (R. 36) and that Oyen then inquired "[h]ow about moral support, is there anything falling under that?" (*id.*). At that point there was some off the record discussion, and the ALJ then announced that "Ms. Byrne decided to act as the representative" (*id.*). From the ALJ's brief inquiry into Byrne's experience it was evident that she was unqualified to serve effectively in that capacity (R. 36–37).[10] Instead of then elicit-

---

10. Reg. §§ 404.1705(b)(2) and 416.1505(b)(2) re-

quire that for a claimant to appoint a non-attor-

ing from Oyen, as he did, her "feel[ing that] your representative is qualified" (R. 37), plainly the ALJ (given his obligation to develop the record fully and fairly) should have followed the directive of *Thompson* and like cases.

Here ALJ Greene did not inform Oyen in *any* terms of her right to counsel, and the record does not contain any prehearing written notice that adequately informs her of that right (see *Thompson,* 933 F.2d at 584–85). Consequently Oyen cannot properly be said to have waived that statutory right.

■ *Binion,* 13 F.3d at 245 further teaches that where a claimant proceeds pro se without a valid waiver of the right to counsel, the appropriate "sanction ... for an ALJ's inadequate explanation of a claimant's rights" is to impose "the burden [ ] on the Secretary to show the ALJ adequately developed the record." [11] And that rationale is equally applicable here. It is irrelevant that Oyen was "represented" at the Hearing by non-attorney Byrne under the just-described circumstances, because the statutory right is not merely to such representation (or pseudo-representation), but to representation by an attorney. This opinion turns then to consideration of whether the ALJ did develop the record both fully and fairly.

*Full and Fair Development of the Record*

■ It might be possible to convert Secretary's burden of establishing that the ALJ developed the record fully and fairly into the nearly impossible task of proving a negative (showing that there are no other potentially relevant items of evidence or lines of inquiry). Instead *Luna,* 22 F.3d at 692 (citing *Thompson,* 933 F.2d at 584) has said:

> Moreover, a significant omission is usually required before this court will find that the Secretary failed to assist *pro se* claimants in developing the record fully and fairly.

■ Here ALJ Greene made a detailed inquiry into Oyen's allegations of pain, her physical abilities and her medication during the thorough 1 hour 44 minute Hearing (R. 34, 98). He also obtained all medical, physical therapy and physician records relevant to Oyen's claim. Furthermore, it was his suggestion, because it appeared that Oyen's showing at the Hearing was inadequate, that an RFC be obtained from Oyen's treating physician Dr. Meyer. It appears that ALJ Greene attempted to be true to his word of trying to give Oyen "every chance" to establish that she was disabled. In sum, Secretary has carried her burden of showing that the record was fully and fairly developed according to the standard set forth in such cases as *Luna,* 22 F.3d at 692–93 and *Binion,* 13 F.3d at 245.

■ That however does not end the analysis. As *Binion, id.* states:

> Once the Secretary establishes that the record was developed fully and fairly, the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap. Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant.

In an effort to show "prejudice or an evidentiary gap" or both, Oyen points (1) to Byrne's failure to cross examine VE Dunleavy and (2) to the ALJ's having given Oyen no opportunity to cross-examine Dr. Meyer as to his post-Hearing RFC (P. Mem. 13–15).

■ On the first of those matters, Oyen has not suggested what other evidence could have been elicited, so there appears to be no evidentiary gap. As for prejudice, Oyen's criticism is that VE Dunleavy was not asked how two of the jobs that he listed could be performed by someone who could not bend (P. Mem. 13). But that does not establish prejudice. Oyen did not testify that she could do no bending at all—she said rather that "I do mostly squatting in [sic] opposed

---

ney representative, he or she must be "capable of giving valuable help to you in connection with your claim." Byrne's description of her past experience confirmed that she had never handled a similar claim at a hearing level and that she simply did not meet the regulatory standard. And that lack of qualification was then recon-firmed by the nature and level of Byrne's participation in the Hearing.

11. *Binion, id.* immediately made clear that "adequately developed" is synonymous with "fully and fairly developed."

to bending" (R. 71). ALJ Greene's hypothetical question referred to a limitation of only occasional stooping, a physical movement that involves bending.[12] And even if Oyen's criticism were credited, it does not extend to any of the other occupations that the VE mentioned, each of which involves a significant number of jobs that Oyen can perform (*Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (holding that 1,400 jobs is a significant number, and citing other cases finding lesser numbers significant)).[13]

■ As for her second argument—that relating to Dr. Meyer's RFC—Oyen's principal objection is that ALJ Greene failed to inform her of her right to cross-examine Dr. Meyer about that report, violating both her right to due process of law and the guidelines in *HALLEX* Ch. I–2–730 A and B (P. Mem. 14, 16). Here she fares better. It is well established that (*Tom v. Heckler*, 779 F.2d 1250, 1252 n. 2 (7th Cir.1985), adapted to fit this case):

> The use of [ ] adverse post-hearing [evidence] without an opportunity to cross-examine its author and to present rebuttal evidence has been held to violate a claimant's right to due process of law.[14]

■ Indeed, the deprivation of a cross-examination opportunity violates a claimant's statutory right under Section 405(b)(1) that an eligibility decision must be made "on the

basis of evidence adduced at the hearing" (*Lonzollo v. Weinberger*, 534 F.2d 712, 714 (7th Cir.1976) (evidence gathered by Appeals Council) ).[15] And as already stated, *HALLEX* Ch. I–2–730 B.2 specifically requires an ALJ who proffers evidence [16] to inform a claimant of the right to cross-examine the author of the evidence by referring in the ALJ's proffer letter to the claimant's right "to request[ ] a supplemental hearing and the opportunity to cross-examine the author(s) of any posthearing report(s)." [17]

■ To be sure, if the ALJ's decision had not looked to Dr. Meyer's RFC at all (as was true with respect to Dr. Kudirka's RFC, see n. 4), the due process and other violations as to that piece of evidence might have been of no moment. But here ALJ Greene gave great weight to Dr. Meyer's RFC report, dedicating nearly an entire single-spaced page of his decision to assessing it, relying on it to find that Oyen did not meet or equal a listed impairment (R. 23), and also relying on it in part to discredit Oyen's subjective allegations of pain (R. 24). Yet ALJ Greene totally failed to mention, either at the Hearing or in his proffer letter, the right of cross-examination with respect to Dr. Meyer's posthearing RFC report. And that violation of Oyen's right, both constitutional and statutory in origin, alone precludes the possibility that ALJ Greene fully and fairly developed

---

**12.** To stoop is "to bend the body forward and downward sometimes simultaneously bending the knees" (*Webster's Third New International Dictionary* 2250 (1986)).

**13.** In at least one respect referred to earlier, the VE's testimony was unclear: the effect on his conclusions if Oyen's testimony as to pain were to be credited. It will be remembered that the test as to a claimant's disability is generally whether he or she can *perform* a job, not whether he or she can *get* one. Even so, it is to be hoped that the availability of meaningful cross-examination of the VE on remand (something that Oyen's lay representative Byrne certainly did not provide) will clear up the uncertainties in the VE's testimony so that the ALJ can reach a fully informed decision.

**14.** [Footnote by this Court] Accord, *Tanner v. Secretary of HHS*, 932 F.2d 1110, 1112 (5th Cir. 1991); *Demenech v. Secretary of HHS*, 913 F.2d 882, 884–85 (11th Cir.1990) (per curiam); *Coffin v. Sullivan*, 895 F.2d 1206, 1212 (8th Cir.1990);

*Townley v. Heckler*, 748 F.2d 109, 114 (2d Cir. 1984); *Allison v. Heckler*, 711 F.2d 145, 147 (10th Cir.1983).

**15.** Naturally the same rule applies where the post-hearing evidence at issue is gathered by an ALJ—see *Wallace v. Bowen*, 869 F.2d 187, 189–93 (3d Cir.1988); *Townley*, 748 F.2d at 114 and *Allison*, 711 F.2d at 147.

**16.** Technically speaking ALJ Greene did not "proffer" Dr. Meyer's RFC report, but the circumstances under which it was provided—essentially under the ALJ's "submit it or else" directive—must be viewed as the practical equivalent of an ALJ proffer.

**17.** Oyen also seeks to call upon Reg. §§ 404.916(f) and 416.1416(f) to support her argument. But those regulations apply to disability hearings held at the reconsideration stage of the procedures governing application for benefits (Reg. §§ 404.916(c) and 416.1416(c) ), *not* to hearings before an ALJ.

the relevant evidence (*Allison,* 711 F.2d at 147), necessitating remand of this case (*Lonzollo,* 534 F.2d at 715).

Oyen also argues that ALJ Greene improperly accepted Dr. Meyer's opinion, expressed in the cover letter to his RFC report, that Oyen could perform some "light" work—improperly because Dr. Meyer was using that term differently than it is defined under the governing regulations. But Oyen is wrong on that score. ALJ Greene expressly noted that "Dr. Meyer's idea of light duty work and that of light work under Act and Regulation are not the same" (R. 23). With that said, he then proceeded to accept Dr. Meyer's report "to the extent that it supports my conclusion that after considering all of the evidence, ... that the claimant can in fact perform a significant range of light and sedentary work as identified by the vocational expert" (R. 23).

▪ Even though Oyen thus fails at the first level of her argument, she prevails on a greater-depth examination—one that looks at the reliability of VE Dunleavy's testimony. ALJ Greene considered that testimony at the fifth step of his sequential evaluation of Oyen's claim, at which point Secretary has the burden of establishing that there are available jobs that Oyen can perform. ALJ Greene's hypothetical questions to the VE assumed a claimant able to do either a full range of light or sedentary work with some non-exertional limitations (R. 86–88).[18] Both of those categories require an ability to work a total eight-hour day at the relevant tasks (see, e.g., *Sample v. Shalala,* 999 F.2d 1138, 1142 n. 6 (7th Cir.1993)).

Here the problem is that no evidence specifically supports the conclusion that Oyen could work for that period of time. As Oyen points out, the boxes in the RFC form checked by Dr. Meyer (R. 258) stated that Oyen could stand or walk for "at least 2 hours" and sit for "less than about 6 hours" during an eight-hour work day. Left unchecked were the other boxes stating that a claimant could stand and/or walk for a total of "about 6 hours" and could sit for a like period. Thus Dr. Meyer's answers did *not,* as stated, add up to an assured eight-hour work day. And Oyen herself testified that with the broken screws in her back she did not know if she was able to work an entire eight-hour day (R. 66–67, 74).

It is thus *possible* that the numbers might add up, but it is entirely possible that they would not. What controls is that absent the benefit of clarifying examination (to say nothing of cross-examination) the ALJ was engaging in speculation. With the record thus being really unsatisfactory as a predicate for the conclusion that Oyen could work a full eight-hour day, Secretary has not met the burden of proof she bears at the fifth step in the sequential evaluation process. In the language of the cases, there is an "evidentiary gap" in the record that shows that ALJ Greene failed to develop the administrative record fully and fairly.

Lastly Oyen asserts that ALJ Greene improperly failed to credit her allegation of pain.[19] But that is simply wrong. Instead ALJ Greene expressly considered the factors listed in the governing regulations and in SSR 88–13 in assessing that contention (R. 23–24). Thus the problem does not lie in the ALJ's final decision not to credit Oyen's allegation of pain as such (R. 26),[20] but rather in

---

**18.** P.Mem. 17–18 also argues that VE Dunleavy's testimony actually supports a finding of disability, because he said that Oyen's need of corrective surgery rendered her "medically unstable" and hence unable to do any work until that surgery was performed. That does not appear to be a fair reading of Dunleavy's testimony. Though his testimony can certainly stand some clarification on remand, the more likely thrust of what he said was that Oyen's need of corrective surgery would make her unattractive to employers, so that job placement personnel would not be "inclined" to help her in securing a job (R. 90).

**19.** One argument that Oyen raised before the ALJ has not been advanced here—the contention in her post-Hearing written objections to Dr. Meyer's RFC report that Dr. Meyer had failed to take into account the two broken screws in her back (Ex. 34 at 2). Although this opinion will not address that argument, Oyen is free to re-raise it on remand.

**20.** Oyen does attack ALJ Green's reliance on her September 3, 1991 "Disability Report" as irrelevant because it listed her activities almost a year before the screws in her back were discovered to be fractured (P.Mem. 20). However, that report has at least some relevance given that Oyen

his having done so in partial reliance on Dr. Meyer's RFC report (R. 24). That reliance again brings into play the ALJ's denial of Oyen's opportunity to cross-examine Dr. Meyer with respect to that report. It is impermissible to speculate on what the outcome would have been if Oyen had been accorded her constitutional and statutory rights. As this Court put it in *Kolesar v. Shalala*, No. 93 C 3834, 1994 WL 30544, at *12, 1994 U.S.Dist. LEXIS 1161, at *41 (N.D.Ill. Feb. 1):

> But this Court cannot properly indulge such a "What if?" exercise, for a reviewing court "cannot rectify [an ALJ's] error by playing administrative law judge" itself (*O'Connor v. Sullivan*, 938 F.2d 70, 73 (7th Cir.1991)).

In summary, the ALJ's decision has been shown to be flawed in more than one respect. And the nature of those flaws is such as to compel a remand.

#### Conclusion

Neither party's summary judgment motion succeeds, but Oyen's alternative motion for a remand must be and is granted. Secretary's motion is of course denied outright. Accordingly Secretary's decision denying benefits is reversed, and this action is remanded for a determination of Oyen's eligibility for benefits consistent with this opinion.[21]

*Travis v. Sullivan*, 985 F.2d 919, 924 (7th Cir.1993) directs that Secretary should normally be given the power to elect whether to refer that determination to the same or to a different ALJ for decision. This Court will of course honor that directive—but given the nature of the several factors that have led to the remand, this Court strongly urges Secretary to exercise her discretion in favor of giving the case a totally fresh start before a new ALJ.

testified that her back pain affected only her abilities to sit, stand and bend (R. 68–71).

21. This is of course a "sentence four" remand and hence a final order within the scope of *Melkonyan v. Sullivan*, 501 U.S. 89, 97–102, 111

S.Ct. 2157, 2162–65, 115 L.Ed.2d 78 (1991), because by definition it is not within the limited domain of "sentence six" of Section 405(g) (*Young v. Sullivan*, 972 F.2d 830, 833–35 (7th Cir.1992)).