**Ezra VINEYARD, Petitioner,**

v.

**Shirley S. CHATER, Commissioner, Social Security Respondent.**

**No. 95 C 6535.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 1, 1996.

---

David R. Bryant, Chicago, IL, for plaintiff.

James B. Burns, Young B. Kim, United States Attorney's Office, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Plaintiff, Ezra Vineyard, applied in April, 1984 for Disability Insurance Benefits for a period from March 6, 1975 to December 31, 1980. After his claim was denied both initially and upon reconsideration, he sought no further review.[1] Tr. at 422–431. In 1992, Mr. Vineyard re-opened his claim, which again was denied.[2] After his claim was denied, Mr. Vineyard requested a hearing before an Administrative Law Judge ("ALJ"). At the hearing on June 24, 1994, Mr. Vineyard was represented by counsel. ALJ Greene denied Mr. Vineyard's request for benefits, Tr. at 21, and the Appeals Council denied Mr. Vineyard's request for review. On August 7, 1995, Mr. Vineyard brought the present action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the defendant, the Commissioner of Health and Human Services ("Commissioner"). Both parties have filed motions for summary judgment. For the reasons set forth below, the Commissioner's motion is granted, and Mr. Vineyard's motion is denied.

### Standard of Review

The Social Security Act ("the Act") provides for limited judicial review of final decisions of the Commissioner. The role of this Court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala,* 997 F.2d 321, 322 (7th Cir.1993). In determining whether the Commissioner's findings are supported by substantial evidence, the district court may not "reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the [Commissioner]." *Edwards v. Sullivan,* 985 F.2d 334, 336–37 (7th Cir.1993). Rather, the court must affirm a decision supported by substantial evidence in the absence of an error of law. *Id.* at 336–37.

### Sequential Evaluation

In order to qualify for Supplemental Security Income and Disability Insurance Benefits, a claimant must be disabled. *Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir.1993). The Act defines a "disabled" individual as one who is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 423(d)(1)(A) (1994); *see also* 20 C.F.R. § 404.1505 (1996). To satisfy this definition, an individual must have a severe impairment which makes her unable to perform her previous work or any other substantial gainful activity which exists in the national economy. 20 C.F.R. § 404.1505 (1996).

The Social Security regulations require the fact finder to follow a five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit has summarized the test as follows:

> The [Commissioner] must determine in sequence: (1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the

---

1. In 1988, Mr. Vineyard filed a separate application for Disability Insurance Benefits and Supplemental Security Income. Upon review in 1990, an Administrative Law Judge granted Mr. Vineyard's Supplemental Security Income claim from the October 3, 1988 filing date forward. That 1990 ruling covers a separate time period from this current re-opened claim for benefits from 1975 to 1980.

2. On May 15, 1992, the Social Security Administration ("SSA") determined that Mr. Vineyard was allowed to re-open his April, 1984 denial on the basis of his membership in a class action decided on December 28, 1990. *Johnson v. Sullivan,* 922 F.2d 346, 352 (7th Cir.1991) (en banc) (allowing consideration of the combined effects of impairments to satisfy the disability standard).

[Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing any work in the national economy. Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job.

*Pope*, 998 F.2d at 477–78 (citation omitted).

In the present case, the ALJ applied this evaluation method and decided the case at step five. The ALJ found that Mr. Vineyard has a history of asthma, hypertension, arthritis, and hidradenitis, but that he did not have an impairment or combination of impairments listed in or medically equal to one listed in the applicable regulations. Concerning Mr. Vineyard's alleged mental impairment, the ALJ found the testimony regarding its existence before 1980 to be lacking in credibility. The ALJ also found that Mr. Vineyard's testimony with respect to his pain and functional limitations during the time period at issue was not fully credible; that he was classified as a younger individual at 33 years of age; and that he had the Residual Functional Capacity ("RFC") to perform a full range of light work. Consequently, the ALJ found Mr. Vineyard was "not disabled" within the meaning of the Act and the applicable regulations. Tr. at 19.

### Existence of Substantial Evidence

At the hearing on June 24, 1994 before ALJ Greene, Mr. Vineyard testified to the following facts. He was born on March 30, 1947, making him thirty-three years old when his insured status expired on December 31, 1980. Tr. at 20, 63. He is divorced and has three children ages twenty-four, twenty, and nine. Tr. at 63. He has a ninth grade education. Tr. at 20, 64. Immediately prior to his alleged disability date,[3] he worked in various jobs for the International Union of Operating Engineers, Local 150, until some time in 1975. Tr. at 140. He has not worked since that time except for a job in 1980 lasting three days as a fire guard in a coal-burning electrical plant. Tr. at 66, 68. He said that although the job required him to "just sit and watch" with no lifting, the working conditions made him too hot and sweaty. Tr. at 67, 68. The salt from the sweat would irritate his skin condition, especially in the absence of the three or four baths he said he was supposed to take per day. Tr. at 68. He seeks disability benefits for a period between March 6, 1975 and December 31, 1980.

Mr. Vineyard alleges that his disability is caused by a combination of factors: asthma, heart murmur, hypertension, hidradenitis,[4] arthritis, and mental stress. Tr. at 7, 146, 152. The ALJ concluded that of all Mr. Vineyard's conditions, only his hidradenitis was significant. Furthermore, the ALJ concluded that although the hidradenitis was "obviously a persistent problem" and "certainly ... irritating," it did not prevent Mr. Vineyard from performing a full range of light work. Tr. at 19. After consideration of the entire record, the ALJ concluded that Mr. Vineyard was not "disabled" within the meaning of the Act because his hidradenitis was not extensive enough to prevent him from working at any job. Tr. at 1. Although Mr. Vineyard testified that his doctors required him to take multiple daily sitz baths,[5] the ALJ concluded that testimony regarding this and other issues of pain and functional limitation were not fully credible. Tr. at 20.

---

**3.** According to a disability report filed in his suit for Supplemental Security Income in 1988, Mr. Vineyard listed August 23, 1975 as the date he stopped working. Tr. at 146. He also said that when his union would not change his job responsibilities to accommodate his condition in 1977, he was retired by his union doctors on August 31, 1978. Tr. at 146. During the most recent hearing before ALJ Greene, however, Mr. Vineyard said that he completely stopped working in August 1975, not April 1975. Tr. at 90. In any event, this opinion does not turn on the issue of the exact date on which Mr. Vineyard stopped working.

**4.** Hidradenitis is a skin condition where the inflammation of glands in the skin causes the obstruction and rupture of the skin's ducts, resulting in inflammation and lesions.

**5.** A sitz bath means soaking in lukewarm water.

Mr. Vineyard argues that the ALJ's findings are not supported by substantial evidence, especially regarding his alleged need for multiple daily sitz baths, and that the ALJ failed to consider the combined effect of his impairments. "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pope*, 998 F.2d at 480 (citation omitted). "'Substantial evidence may be something less than the greater weight or preponderance of the evidence' and a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion." *Oyen v. Shalala*, 865 F.Supp. 497, 507 (N.D.Ill. 1994) (citations omitted). The medical record provides substantial evidence for the ALJ's findings and conclusions.

■ First, I can find little evidence in the voluminous medical records indicating that Mr. Vineyard's doctors had instructed him to take sitz baths three to four times daily during the period in question. Although Mr. Vineyard may have been treated with sitz baths as part of his recovery following surgery, *see, e.g.*, Tr. at 592, he rarely was told to continue with these baths on his own. In June, 1979, following a surgical removal of cysts, Mr. Vineyard was instructed "to pack his wound daily and take Sitz baths at home." Tr. at 481. Sitz baths also were recommended to him following treatment at a VA hospital in November, 1980. Tr. at 563. These instructions, however, do not indicate how often or for how long Mr. Vineyard should continue taking sitz baths. Arguably, the sitz baths were only necessary until his surgical wounds had healed because they were prescribed as a course of treatment following surgery. The only other instance in the medical records where I find any reference to this type of treatment occurred in August, 1980. After treatment at an emergency room, Mr. Vineyard was told to apply warm, moist heat to the affected areas for twenty minutes, four times a day. Tr. at 478. This form of treatment, however, is not exactly the same as a sitz bath.

On the other hand, evidence in the record reveals that on several occasions Mr. Vineyard was not instructed to take sitz baths.

Following a surgical procedure to relieve symptoms of his hidradenitis, Mr. Vineyard was taking medication and sitz baths while in the hospital. Tr. at 592. Upon his discharge, Mr. Vineyard was told to continue only with his medication, and no mention is made concerning the baths. *Id.* Moreover, a review of Mr. Vineyard's medical history reveals that one of his regular treating physicians, Dr. Milo, did not prescribe sitz baths until 1991. *See* Tr. at 586–589. Finally, the ALJ found Mr. Vineyard's testimony regarding his need for three or four sitz baths daily not fully credible, and this determination must stand because it is not "patently wrong in view of the cold record." *Imani ex rel. Hayes v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986). Given this lack of evidence relating to the need for Mr. Vineyard to take sitz baths, I cannot say that the ALJ's decision is not supported by substantial evidence on this point.

■ Mr. Vineyard did have approximately eight to ten surgical operations from 1975 to 1980 to treat his hidradenitis. Yet the ALJ found that each hospitalization was for a relatively short period of time, that Mr. Vineyard did not have significant complications, and that Mr. Vineyard did not report having any side effects from the medication he took for his symptoms. Tr. at 18. These findings are supported by the record. For example, after one such surgery, Mr. Vineyard did well postoperatively and had "requested to be discharged the next day." Tr. at 501. On other occasions, he was discharged within three days of the surgery and always had done well postoperatively. Tr. at 481, 591. Against this backdrop, the ALJ's conclusion to interpret the medical record as "not requiring extensive therapy or treatment" is substantially supported by the record.

■ The ALJ also found that no evidence supported the existence of any mental impairment during the relevant time period. Tr. at 18. Once again, this conclusion is supported by substantial evidence. Mr. Vineyard did not tell anyone outside of his wife and possibly his mother about his alleged mental problems. Tr. at 97. In 1973, he visited a VA psychiatrist's office, but he left before being seen by the psychiatrist.

Tr. at 99–100. In 1977, the SSA sent Mr. Vineyard for a psychological evaluation, but he refused to go. Tr. at 84. Furthermore, he knew that VA hospitals had psychologists and psychiatrists on staff, but during all of his surgical treatments he did not mention his mental condition or seek any treatment. Tr. at 98. Finally, on a Psychiatric Review Technique Form dated September 29, 1992, Dr. Paul Caldwell wrote that there was "no medical evidence of any psychiatric disorder present on or before December 31, 1980." Tr. at 437. Given this lack of evidence demonstrating a mental impairment and the fact that "the claimant ... bears the responsibility of providing evidence of a mental impairment," *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir.1991), the ALJ's determination is clearly supported by substantial evidence.

■ Finally, Mr. Vineyard argues that the ALJ did not meet his burden of persuasion to prove that Mr. Vineyard had the RFC to engage in a full range of light work. When a claim for benefits reaches step five of the sequential analysis, the Commissioner bears the burden of persuasion to demonstrate that the claimant can do some other job that exists in significant numbers in the national economy. *Pope*, 998 F.2d at 477–78. The Commissioner must show that the claimant has the ability to do such a job based on the claimant's RFC combined with the claimant's vocational characteristics. 20 C.F.R. § 404.1561 (1996). The ALJ reasonably found that recurrent hidradenitis was the only severe impairment suffered by Mr. Vineyard. Tr. at 19. The ALJ did consider the real hardship and irritation caused by the hidradenitis, calling it an "obviously persistent problem." *Id.* Nevertheless, the ALJ concluded that Mr. Vineyard was capable of performing a full range of light work. *Id.* During that five year time period, Mr. Vineyard did not have a demonstrated need for sitz baths several times per day which would have interfered with a job. Moreover, even if Mr. Vineyard had surgery once a year, it would take him only a short time to recover, as discussed above, thereby permitting him to do light work.

The medical records do not support Mr. Vineyard's contention that he could not do light work. None of the physicians' reports before 1981 indicate either that Mr. Vineyard has limitations to the extent he claims or that he is not capable of doing light work. *See Anderson v. Bowen*, 868 F.2d 921, 926 (7th Cir.1989) (upholding a determination that a claimant could do light work where none of his physicians found that he was unable to perform light work). In fact, based on a September, 1992 RFC assessment, the Illinois Department of Rehabilitation Services concluded that Mr. Vineyard could have performed his past job as an operating engineer, as he described it, and therefore he was not disabled prior to 1981. Tr. at 449. This report adds support for the ALJ's conclusion that Mr. Vineyard at least could perform light work, even though the ALJ found that Mr. Vineyard could not perform his past job based on his condition. Beside the lack of medical evidence, the ALJ took into account Mr. Vineyard's young age, educational level, work history, and RFC when deciding that Mr. Vineyard could have engaged in a full range of light work. Tr. at 19.[6] Consequently, the ALJ carried his burden of persuasion, and I can find no basis upon which to disturb his judgment.

### Consideration of the Johnson Factors

■ An ALJ is required to consider the combined effect of all of a claimant's impairments on that claimant's ability to work. *Johnson v. Sullivan*, 922 F.2d 346, 351–52 (7th Cir.1990). Even if no one impairment is severe enough, a combination of several may render a claimant disabled and unable to work. *See id.* Mr. Vineyard has claimed that the ALJ did not consider the combination of all his impairments when making his

---

6. Mr. Vineyard's arguments concerning the supposed preclusive effects of his 1990 adjudication for disability benefits are misplaced. That adjudication covered the time period from October, 1988 to the present. The time period in the instant case is eight to thirteen years earlier. Mr. Vineyard's condition may have and likely did deteriorate in the interim period. As such, his 1990 adjudication awarding benefits for that time period cannot be given preclusive effect in an adjudication for benefits for an earlier period. *See Rucker v. Chater*, 92 F.3d 492, 495 (7th Cir.1996); 59 Fed.Reg. 34850 (July 7, 1994).

findings and conclusions. Specifically, Mr. Vineyard argues that the ALJ did not account for his arthritis or mental impairment.

The ALJ explicitly stated that he accounted for the combined effect of Mr. Vineyard's hidradenitis, asthma, and hypertension. Tr. at 20. Although, the ALJ did not mention Mr. Vineyard's alleged arthritic condition in the findings section of his opinion, he did discuss it within the body of his opinion. In fact, he discussed arthritis in the same paragraph as the other three conditions noted in the findings. Tr. at 15. Based on the medical evidence and testimony, the ALJ stated that *"they* [these conditions] impose no significant limitations on the claimant. The claimant has not sought any significant treatment for his asthma, *arthritis,* or hypertension.... the claimant did not allege disability as a result of *these* problems." *Id.* (emphasis added). By referring to all of these conditions together in his analysis, the ALJ's opinion shows that he considered them all when making his findings and conclusions.

With respect to Mr. Vineyard's alleged mental impairment, the ALJ's findings do not state that he considered them. Yet the ALJ noted earlier in the opinion that he did not find any medical evidence in the record or hear any credible testimony to support Mr. Vineyard's claims regarding this impairment. Tr. at 18–19. Earlier in this opinion, I found that the ALJ's determination of no mental impairment was supported by substantial evidence, and that finding applies with equal effect to this part of the Court's analysis. Consequently, the ALJ was not required to consider an impairment for which he found no evidence of its existence at the relevant time. Hence, by addressing the combined impact of each factor clearly established by the medical evidence, the ALJ followed the requirements of *Johnson.*

### *Alleged Failure to Adequately Develop the Record or Request Another Psychiatric Review*

▮ Mr. Vineyard argues that the ALJ failed to develop an adequate record which contained a "thorough discussion and analy-

sis of the objective medical evidence and the nonmedical evidence," especially regarding his alleged mental impairment and need for multiple daily sitz baths. In addition, Mr. Vineyard claims that the ALJ committed reversible error by choosing not to complete another Psychiatric Review Technique Form regarding Mr. Vineyard's mental impairment during the relevant period. Neither of these issues were raised in Mr. Vineyard's request for review before the Appeals Council. Tr. at 7. Mr. Vineyard had the responsibility to raise these procedural issues in his request for review before the Appeals Council. *Pope,* 998 F.2d at 480 n. 6. He failed to raise these claims administratively thereby denying the Appeals Council an opportunity to resolve these issues first.[7] I therefore must decline to address them. *Pope,* 998 F.2d at 480 n. 6; *Papendick v. Sullivan,* 969 F.2d 298, 302 (7th Cir.1992).

### *Conclusion*

For the reasons set forth above, the Commissioner's motion for summary judgment is granted, and Mr. Vineyard's motion for summary judgment is denied.

---

7. Although the Appeals Council declined Mr. Vineyard's request for review, that result might have been different had he presented these issues to them.