Howard HUGHES, Plaintiff,

v.

Shirley S. CHATER, Commissioner
of Social Security,[1] Defendant.

No. 94 C 7018.

United States District Court,
N.D. Illinois,
Eastern Division.

July 25, 1995.

1. This action was actually brought against Health and Human Services Secretary ("Secretary") Donna Shalala. Pursuant to Fed.R.Civ.P. ("Rule") 25(d) and the Social Security Independence and Program Improvements Act of 1994, P.L. No. 103–296, § 106(d), 1994 U.S.C.C.A.N. (108 Stat.) 1464, 1476–77, the Commissioner of Social Security is substituted for Secretary as the named defendant and will be referred to as such throughout this opinion.

Marcie Goldbloom, Chicago, IL, for plaintiff.

Jack Donatelli, A.U.S.A., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Howard Hughes ("Hughes") appeals the final decision of Commissioner of Social Se-

curity Shirley Chater ("Commissioner") denying Hughes' claims for disability insurance benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423.[2] Fifty-five-year-old Hughes suffers from severe arthritis. At issue is the date upon which his arthritis and other maladies so hindered his activities that they rose to the level of a disability under the Act. Now claiming a February 7, 1991 onset date,[3] Hughes argues that he is entitled to disability benefits because he was in fact disabled before his insured status lapsed on March 31, 1991 (see Reg. §§ 404.130–132) (R. 103).[4]

As is usual in such cases, Hughes and Commissioner have filed cross-motions for summary judgment under Rule 56, with Hughes moving alternatively for a remand. For the reasons stated in this memorandum opinion and order, the cross-motions are denied and Hughes' motion for a remand is granted.

### Background [5]

Hughes stands about 6 feet tall and weighed about 137 pounds at the time of the Hearing, though his "original" weight was 160 (R. 43). He has never been married, has no children and rents a room in his aunt's home (R. 44–45). Hughes has no vocational or specialized job training (R. 48)—having quit school after the 11th grade, Hughes completed his GED in 1979 while incarcerat-

2. Further citations to the Act's provisions will take the form "Section—," using the Title 42 numbering rather than the Act's internal numbering. Pertinent regulations from 20 C.F.R. are cited "Reg. § —." Citations to the administrative record will take the form "R.—." Social Security Regulations are cited "SSR—."

3. In his February 7, 1991 application for disability insurance benefits Hughes originally claimed a March 6, 1988 onset date (R. 93, 105)—despite his own admission that he was lifting kegs of beer weighing over 100 pounds until March or April 1989 and quit only because he was denied a promotion (R. 49–51). After having retreated from that position in her letter to the Appeals Council, Hughes' counsel has now settled on the claimed February 7, 1991 onset date (P.Mem. 9 n. 9), though conceding the absence of a formal amendment despite the suggestion of the Administrative Law Judge ("ALJ") to do so (id.; R. 88).

4. ALJ Richard Sprague determined that Hughes' date of disability was October 1, 1992 because Hughes was found capable of performing only sedentary work thereafter, rendering him disabled under the Medical–Vocational Guidelines, Reg. Pt. 404, Subpt. P, App. 2, Table 1, Rule 201.12 (R. 20–21).

5. What follows has been distilled from the administrative record, including the transcript of Hughes' October 28, 1993 hearing (the "Hearing") before ALJ Sprague. Because Hughes' testimony as to his employment, imprisonment and other activities both before and after the claimed onset of his disability was uncontradicted at the Hearing, the text borrows liberally from his testimony, omitting the constant repetition of "Hughes testified." One other thing: This opinion departs from stylebook usage by using numerals instead of words for all numbers of any magnitude (except when a number begins a sentence).

ed for armed robbery (R. 47–48, 55). During that same term of imprisonment Hughes first hurt his back when he was "lifting some iron" (R. 56). He was hospitalized for 3 days (R. 56–57).

Though Hughes had earlier employment, the ALJ asked that he focus only on the 15–year period before the Hearing (R. 54). In 1982 Hughes worked on an assembly line for 6 to 8 months (R. 51–54), a job that involved some sitting, walking and standing (R. 52). When he acted as a runner delivering "various objects" to "various places" in the company, those objects ranged from 3 to 30 pounds, though most weighed less than 10 pounds (R. 53). During Hughes' tenure in that position he entered the hospital for a foot operation, but when he returned to work he found that he was fired (R. 51–52).

From 1984 to 1989 Hughes worked as a porter in the commissary at Chicago Stadium (R. 49–50). There his responsibilities included manually hauling kegs of beer up staircases about 3 days a week (R. 50). He also handled boxes of stock of different weights, but enlisted the aid of a dolly when moving them to storage (R. 51).

Between jobs Hughes spent much of his time in prison. From 1959 to 1964 he had been imprisoned for possession of cannabis and violation of probation (R. 54). In 1965 he returned to prison to serve 2 more years for possession of cannabis (R. 55). From 1970 to 1974 he was incarcerated for robbery (id.), only to return to prison later in 1974 to serve a 5–year sentence on an armed robbery conviction (id.). Hughes also spent approximately 10 months of 1990 in prison for burglary (R. 56).

As if to emulate (at least in some respects) the eccentric billionaire of the same name, on a typical day Hughes mostly sleeps, reads or watches television (R. 64).[6] He usually stays in his house but takes an occasional 2–block walk on warm days (R. 64, 72).

## Medical Evidence

### Hughes' Testimony

Hughes complains of a deteriorated right triceps, pain in his spine and swelling in his left hand and shoulder (R. 59). He has arthritic pain in both hips, his neck and both shoulders (id.). His legs, feet and one knee were swollen and numb at the Hearing (id.). He also suffers from a slight nervous disorder that he refers to as muscular sclerosis, which originated when he was hit by a truck a long time ago (id.).

Hughes' pain from all these maladies has gradually worsened over the years (R. 63) so that he can only sleep about 4½ hours each night (R. 68) and walk with the aid of a cane (R. 65–66). Hughes soaks in the tub about 4 times a week to ease his pain temporarily, but he usually just tries to sleep through it (R. 70). When asked which of his ailments bothered him the most, Hughes responded "all of them" (R. 59).[7]

When asked about the genesis of his pain, Hughes first noted that he had been shot twice, once in his left thigh in 1965 and once in his back in 1980 (R. 60). When doctors mended his leg they "tied up a nerve in there," resulting in discomfort when the leg swells (R. 61). To correct a condition that he referred to as "hammer toes," [8] Hughes also underwent surgery that involved the insertion of metal plates in both feet (R. 61–62). His last hospital stay was during 1980, when he received treatment for a blow to the head sustained during a robbery attempt (Hughes

---

6. Donald Barlett & James Steele, *Empire: The Life, Legend, and Madness of Howard Hughes* 496 (W.W. Norton & Co. 1979) described the last years of the famous record-setting aviator, business magnate and Hollywood playboy:

> Hughes, of course, seldom left his bed now, and then only to be carried to the bathroom. He spent most of his waking hours watching motion pictures over and over again or just lying in bed staring blankly upward.

7. Though his earlier convictions for possession of cannabis might raise the question whether Hughes also suffers from substance abuse, Hughes testified that he last used cannabis in 1991 and has had only "a few drinks" since then (R. 57). He brought his problems in that regard under control himself, without formal treatment (R. 58).

8. According to *Dorland's Illustrated Medical Dictionary* ["Dorland's"] 1716 (28th ed. 1994):

> a condition in which the proximal phalanx of a toe—most often that of the second toe—is extended and the second and distal phalanges are flexed, causing a clawlike appearance.

was the victim) (R. 62). His speech was slurred for about a month, and he continues to suffer frequent headaches (R. 63).

During the Hearing the ALJ attempted to establish the point at which Hughes' respective maladies became disabling. Here is what Hughes had to say (R. 63–65):

Q: When did they get real bad?

A: Well, they got real bad last year, after I, I came to, down here the last time, when I talked to this, this doctor, what's his name?

\*　\*　\*　\*　\*　\*

A: Yeah and it just got worse since then, I got sick, I suffer tremendously. . . .

Q: How bad did your condition get back, get bad after July, '92?

A: It got real bad, it's real, it's hard for me to sleep, you know what I'm saying, sometimes I try to sit up and sometime I can't lay down, sometime I have to stretch across the table like this, lean forward, with seven or eight pillows up there because the pain is tremendous all up in here and in here and I get numb. This is the reason for, for the blood circulation pills, Tritol (phonetic), that they gave me.

Q: Were your activities better before July, '92, could you do more things and get around better and that?

A: Yeah, I could get around a little bit better but now, I don't, I don't hardly get around none, I be in the house most of the time. Weather like this here, if I didn't have to come down here, I would be in right now and I mostly sleep, I may watch television for about a hour or so or try to read, other than that, I be asleep, take a walk every now and then for maybe about two blocks at the most.

Q: Now, we don't have any medical reports from about, I guess about March of '91, that was Dr. Kaplan, to about August of '93, were you doing pretty good during that period, is that why you—

A: When?

Q: March of '91 to August of '93?

A: Well now—

Atty: August of '93? This is Dr.—

ALJ: Yeah, right, I'm sorry, August of '92.

A: '92 I was hurting.

Q: Huh?

A: '92 I was hurting real bad but I, '91 I was hurting but I wasn't hurting in '91 like I was in '92 up to now.

Q: And that's why you didn't see a doctor.

A: Yeah and Dr. Kaplan is no longer at that place no more, Stone Island, in fact he quit the place there, where he was doctor at the medical center.

Q: And then you starting seeing a doctor in August of '92 because your condition was getting real bad.

A: Yeah, worse, worse, it got worse.

Because of his pain Hughes can only stand for 5 or 10 minutes at a time (R. 74). He is able to take care of his personal needs such as washing, shaving and dressing with some difficulty and pain (R. 70). He is unable to do any housework, cooking, laundry or lawn work, and he can lift only about 10 pounds (R. 71, 75). He smokes about 3 or 4 cigarettes a day but has not used drugs or alcohol since 1991 (R. 57, 71).

*Formal Evaluations*

*Physical Impairments*

According to the exhibits presented at the Hearing, Dr. Robert Kaplan treated Hughes from December 12, 1990 until March 6, 1991 (R. 2).[9] Dr. Kaplan's records refer to a December 12, 1990 x-ray interpreted this way by Dr. Narain Sawlani (R. 125, 126):

*VIEWS OF THE LUMBARSACRAL SPINE*; DEGENERATIVE CHANGES WITH OSTEOPHYTE FORMATION.[10]

---

9. Further records submitted *after* the Hearing, tending to show that Dr. Kaplan treated Hughes until December 1993 (R. 217–226), are the subject of vigorous debate by the parties and are best treated separately and later in this opinion.

10. [Footnote by this Court] According to *Dorland's* 1202:

　a bony excrescence or osseous outgrowth.

THERE IS MARKED NARROWING OF THE DISC SPACE BETWEEN L1–L2 AND L2–L3. POSSIBILITY OF OLD TRAUMA IN THIS AREA SHOULD BE CLINICALLY CONSIDERED. POSSIBILITY OF NARROWING OF THE DISC SPACE BETWEEN L5–S1 CAN NOT BE RULED OUT. NEGATIVE FOR SPONDYLOLISTHESIS.[11]

IMPRESSION:

DEGENERATIVE CHANGES LUMBARSACRAL SPINE MORE MARKED IN THE UPPER LUMBAR AREA. POSSIBILITY OF OLD TRAUMA IN THIS AREA SHOULD BE CLINICALLY CONSIDERED.

ADVISE CLINICAL CORRELATION.

On January 29, 1991 Dr. Kaplan noted on a "Certificate to Return to School or Work" that Hughes was not able to return to work due to "arthritis in the lumbo-sacral spine, feet, etc." (R. 124). Just over a month later, on March 6, 1991, Dr. Kaplan again examined Hughes and filled out an extensive Arthritic Report, noting that Hughes suffered from "osteo-arthritis [12] LS-spine with narrowed disc spaces at L1–2, L2–3, L5–S1," from disc and bone degeneration and from spasms in the paraspinal muscles (R. 126). There was also evidence of "cervical and/or lumbar nerve root compression or peripheral neuropathy" (R. 128). Nevertheless Dr. Kaplan concluded that Hughes' ambulation was normal (R. 127), that he exhibited no abnormal weakness (id.) and that his mental status was "essentially normal" (R. 128).

When Hughes submitted his application for disability insurance benefits in February 1991, he was interviewed by an SSA interviewer, who noted that the "claimant walks as though he can not stand straight up" but also observed that his "appearance and behavior were normal" (R. 112). On March 19, 1991 Dr. E.C. Bone completed a Residual Physical Functional Capacity ["RFC"] Assessment of Hughes (R. 129–136), finding that Hughes suffered from osteoarthritis, narrowed disc spaces and muscle spasms (R. 130). Nevertheless Dr. Bone concluded that Hughes was capable of (R. 130):

| | |
|---|---|
| Lifting/carrying 25 lbs: | Frequently |
| Lifting/carrying 50 lbs: | Occasionally |
| Standing/walking in 8 hr. workday: | About 6 hours |
| Sitting in 8 hr. workday: | About 6 hours |
| Push and pull: | Unlimited except as already noted |

On the next day a vocational assessment specialist reviewed Hughes' application and concluded that he was not disabled because he could still perform several jobs requiring only light work (R. 113). Then on March 28 Dr. Eugene Wenthe signed a Social Security Administration Disability Determination and Transmittal stating that while Hughes suffered from "osteoarthritis of LS Spine," he was not disabled (R. 122).

Hughes next filed for reconsideration of his application. On July 2, 1991 he met again with the same SSA interviewer who had completed the first report. During that second interview Hughes had no difficulty in walking, though he still did not "stand up straight" (R. 118). On July 22, 1991 Dr. Charles Kenney completed another RFC Assessment (R. 137–44), reaching conclusions identical to those of Dr. Bone. On July 31, 1991 Dr. Bone reaffirmed his original determination that Hughes was not disabled (R. 123).[13]

ALJ Sprague noted during the Hearing that there was a gap in the medical reports

11. [Footnote by this Court] According to Dorland's 1563:

forward displacement (olisthy) of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis.

12. [Footnote by this Court] According to Dorland's 1199:

noninflammatory degenerative joint disease occurring chiefly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain (usually before prolonged activity) and stiffness (particularly after prolonged activity). "Osteoarthritis is almost universally found in the adult population and, roentgenographically, the spine is the most commonly involved site" (6 Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties § 44A.37, at 739 (James Zimmerly ed., 3rd ed. 1991)).

13. Hughes does not challenge the reconsideration procedure under which Dr. Bone himself reconfirmed his earlier determination.

between March 1991 and August 1992 (R. 64–65), when Hughes' general medical condition began to be reviewed on a monthly basis beginning August 11, 1992 and ending May 3, 1993 (R. 201–03). While those latter reports are unsigned, Hughes' testimony as to the dates of his treatment (R. 64–65) and the medications prescribed by Dr. V.W. Steward (R. 69) suggest that the notes were recorded by Dr. Steward. Under Dr. Steward's care Hughes' weight fluctuated from 129 to 145 pounds, but there is no mention of spinal abnormality or arthritis until May 3, 1993, when Dr. Steward ordered a shoulder x-ray (R. 203). Dr. Sawlani reviewed that x-ray and concluded (R. 200):

> VIEWS OF THE LEFT SHOULDER; DEGENERATIVE CHANGES ARE NOTED IN THE VISUALIZED ACRO-MIOCLAVICULAR JOINT WITH SCLEROSIS AND OSTEOPHYTE FOR-MATION. NO OTHER SIGNIFICANT VISUALIZED BONY ABNORMALITY DEMONSTRATED.
>
> ADVISE CLINICAL CORELATION [sic].

Dr. Steward also completed a Physical Capacities Evaluation Form for Hughes on May 2, 1992 in which he found that Hughes was limited to (R. 150–51):

| | |
|---|---|
| Lifting 21–25 lbs: | Occasionally |
| Lifting 26–50 lbs: | Never |
| Stand in 8 hr. workday: | 1 hour |
| Walk in 8 hr. workday: | 1 hour |
| Sit in 8 hr. workday: | 2 hour |
| Push and pull: | Unlimited except as already noted |

Hughes could not climb at all and could only occasionally bend, squat and crawl (R. 151).

Dr. Jordon Trafimow completed a consultative report on Hughes that was later considered at the Hearing. On July 23, 1992 Dr. Trafimow found that x-rays of the lumbar spine were normal and that joint spaces were well maintained (R. 177). Cervical spine x-rays were also "basically normal" except for some narrowing of the joint spaces and some osteophytes at C6–C7, C5–C6 and C4–C5 (id.). During the examination Hughes claimed that he could not bend, but he was able to bend while getting into a chair (R. 176). Hughes also claimed that he could not raise his arms past 45° of elevation, yet proceeded to put his arms over his head to

remove his shirt (R. 176–77). Finally, while Hughes claimed that he could flex his spine only about 40°, he flexed to 90° with no difficulty when getting out of the chair (R. 177). In sum, Dr. Trafimow was "unable to find any objective evidence of the reasons for the claimant's pain" (R. 178), though he noted that Hughes could only "stand and/or walk" for 4 hours in an 8–hour day (R. 180).

Toward the end of the Hearing, Hughes' attorney suggested that an updated consultative evaluation complete with new x-rays be ordered to supplement the record. Dr. Leonard Smith conducted that updated evaluation ordered by the ALJ on January 11, 1994 (R. 204–08). Hughes' gait was then normal (R. 205). Dr. Smith examined Hughes' lumbar spine and found that Hughes was a "well-developed, well-nourished male in no acute distress" (R. 204). But roentgenograms taken of the lumbar spine revealed degenerative disc disease at L5–S1, narrowing of the disc space and "rather marked degenerative changes throughout the lumbar spine" (R. 206). Moderate scoliosis was also noted (id.). Compression tests on the cervical spine were also normal, though Dr. Smith noted subjective tenderness in the left trapezius area (R. 205). One joint in Hughes' left shoulder was found to have undergone degenerative changes, and there was atrophy in his right upper arm due to an old injury (R. 205–06). Atrophy in his right hand was also evident, and the thumb on his left hand exhibited some thickening and degenerative changes (R. 205). Dr. Smith concluded that Hughes is "an asthenic individual, who is apparently in a poor nutritional status" (R. 206). He found that in an 8–hour day Hughes could (R. 207–08):

| | |
|---|---|
| Lift/carry 10 lbs: | Occasionally |
| Lift/carry 5 lbs: | Frequently |
| Stand/walk: | 5–6 hours (1–2 without interruption) |
| Sit: | Unlimited |

Hughes could also occasionally kneel, crouch and stoop, and he could push and pull up to 5 to 10 pounds (R. 208).

*Mental Impairments*

Hughes was examined before the Hearing (on June 19, 1992) by psychologist Norman Kerr ("Kerr"), Ph.D., A.B.P.P. Dr. Kerr administered a battery of psychological tests

to Hughes and summarized his findings in a 5–page report (R. 155–59). Dr. Kerr found that Hughes "was mentally oriented to time and place and in contact with reality" (R. 157). Dr. Kerr also found that Hughes' verbal abilities "significantly exceed his performance skills," though Dr. Kerr said "it is possible that his deficiencies in [the non-verbal] area stem from his arthritic condition in his hands, arms and fingers" (R. 158). Dr. Kerr concluded (R. 158–59):

> Psychodiagnostically, Mr. Hughes, age 52, has a pervasive and enduring pattern of antisocial behavior beginning in early adolescence and continuing into adulthood although less obvious since reaching middle age. This antisocial personality disorder has been characterized by the onset of a conduct disorder in early adolescence with subsequent failures to conform to social norms with respect to lawful behavior during adulthood. Associated with the foregoing has been a heavy and prolonged substance abuse disorder. While these two chronic disorders now appear to be ameliorated due probably to the effects of medical treatment, periods of forced confinement and advancing age, he has nevertheless not regained his premorbid health status because of co-existing non-mental impairments. For the foregoing reason, it is the examiner's opinion that he has not achieved an adequate level of adaptation that is required to engage in sustained gainful work activity....

Dr. Kerr's conclusions are echoed in his Mental RFC Evaluation of Hughes (R. 160–63). According to that evaluation Hughes' impairment will seriously affect virtually every aspect of his life from his daily living activities to his ability to understand complex instructions and interact appropriately with supervisors (R. 161–62). Dr. Kerr sums up Hughes' limitations by stating (R. 162):

> The patient's non-mental disabilities will impact on his mental status resulting in decomposition if placed in a competitive stressful work situation.

At the Hearing Dr. Benjamin Blackman, a psychiatrist serving as the medical consultant to the ALJ, testified that he had reviewed the psychological test data gathered by Dr. Kerr and disagreed with the latter's conclusions (R. 81):

> [F]rom a mental point of view, the test does not indicate limitations, other than perhaps the claimant would have difficulty with complex tasks because of his low normal IQ, his full-scale IQ was 81. And from his testimony this morning, the entire testimony revolved around physical problems, I was not able to discern that he would have any work-related limitations from (INAUDIBLE).

Dr. Blackman also disagreed with Dr. Kerr's conclusion that Hughes would have difficulty interacting with supervisors and their demands in a competitive workplace. According to Dr. Blackman, Hughes had simply *chosen* not to exercise his ability to interact well (R. 85).

### Statutory and Regulatory Framework

Under Section 423(a)(1) a person is eligible for disability benefits if he or she:

> (A) is insured for disability insurance benefits ...,
>
> (B) has not attained retirement age ...,
>
> (C) has filed application for disability insurance benefits, and
>
> (D) is under a disability....

"Disability" is defined in pertinent part as the inability (Section 423(d)(1)(A)):

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can expected to last for a continuous period of not less than 12 months....

*Wolfe v. Shalala,* 997 F.2d 321, 322–23 (7th Cir.1993) (citations omitted) recites the familiar 5–step process that guides Commissioner's sequential evaluation of a disability claim:

> In determining disability, the ALJ was required to address each of the following questions in sequential order: (1) Is the claimant presently employed? (2) Is the claimant's impairment or combination of impairments severe? (3) Do his or her impairments meet or exceed any of the specific impairments listed in 20 C.F.R. Pt.

404, Subpt. P., App. 1 which the Secretary acknowledges to be conclusively disabling? (4) Have the claimant's impairments limited his or her remaining or "residual" functional capacity to the point that he or she is no longer able to perform the demands and duties of a former occupation? (5) Is the claimant unable to perform any other work in the national economy given his or her age, education and work experience?

> A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at step three or five results in a finding of disability.

See also *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). In that process it is generally the claimant's burden to establish that he or she became disabled on or before the date last insured (*Meredith v. Bowen*, 833 F.2d 650, 652 n. 1 (7th Cir.1987)).

▇▇▇ At step 4 a claimant will be deemed "not disabled" if he or she can perform *either* (*Wolfe*, 997 F.2d at 323, quoting SSR 82–61 (emphasis in original)):

> 1. The actual functional demands and job duties of a particular past relevant [14] job; *or*
> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

And where a claimant's assertions of pain are at issue, *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir.1994) (citations omitted) teaches:

> Once the presence of a medically determinable physical or mental impairment is established that could reasonably be expected to produce the pain alleged, but the intensity or persistence of the pain is unsubstantiated by the medical record, the ALJ is obliged to examine and weigh all the evidence including observations by treating and examining physicians, third-party testimony, the claimant's testimony and daily activities, functional restrictions, pain medication taken, and aggravating or precipitating factors to evaluate how much the claimant's impairment affects his ability to work.

### Procedural History and Administrative Findings

As stated earlier, Hughes applied for disability insurance benefits on February 7, 1991 (R. 93). That application was initially denied on April 4, 1991 (R. 96–98) because he was found capable of performing "a limited range of medium work" (R. 96). Hughes filed a Request for Reconsideration (R. 99), which was also denied (P.Mem. 1).

Next Hughes requested (R. 90) and was afforded the Hearing pursuant to Section 405(b). That resulted in ALJ Sprague's denial of Hughes' application because of his failure to demonstrate that he was incapable of performing any of his past jobs on or before March 31, 1991 (a step 4 determination) (R. 19). ALJ Sprague's opinion included these findings (R. 20–21):

2. The medical evidence establishes that the claimant has severe generalized arthritis, substance abuse in remission, and a mild personality disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. Since about October 1, 1992, many of the claimant's complaints have been supported by the medical evidence.

4. Since October 1, 1992, the claimant has been limited in performing sustained walking or standing, or lifting occasionally more than 10 pounds.

5. Since October 1, 1992, the claimant has been unable to perform his past relevant work as a porter or assembler. Prior to October 1, 1992, he could perform his past relevant work.

6. Since October 1, 1992, the claimant has had the residual functional capacity to per-

---

**14.** [Footnote by this Court] *Wolfe*, 997 F.2d at 323 n. 4 (citations omitted) states:

> To be relevant, past work must have been done within the last 15 years, lasted long enough for the person to learn to do it, and constituted "substantial gainful activity."

form the full range of sedentary work (20 CFR 416.967).

\* \* \* \* \* \*

10. Section 416.969 of Regulations No. 16 and Rule 201.12, Table No. 1, Appendix 2, Subpart P, Regulations No. 4, direct that the claimant, considering his residual functional capacity, age, education, and work experience, be found "disabled".

11. The claimant has been under a "disability" as defined in the Social Security Act, since October 1, 1992, but not before (20 CFR 416.920(f)).

On September 22, 1994 the Appeals Council denied review of ALJ Sprague's decision (R. 6–7). That decision thus became Commissioner's final decision (Reg. § 404.981; *Diaz v. Chater,* 55 F.3d 300, 305 n. 1 (7th Cir.1995.)).

### Standard of Review

■ Section 405(g) empowers this Court to affirm, modify or reverse Commissioner's decision with or without remand for rehearing. When such a review deals with the proper construction of the governing statute and regulations, it presents a question of law that is reviewed de novo (*Dotson v. Shalala,* 1 F.3d 571, 575 (7th Cir.1993)). By contrast, *Diaz,* 55 F.3d at 305–06 (citations omitted, and adapted to this case) sets out the standard of factual review:

> Our review of the SSA's decision is limited. 42 U.S.C. § 405(g) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive."). We shall affirm the SSA's finding if it is supported by substantial evidence. Although a mere scintilla of proof will not suffice to uphold the SSA's findings, the standard of substantial evidence requires no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." We cannot substitute our own judgment for that of the SSA by reevaluating the facts, or reweigh-

ing the evidence to decide whether a claimant is in fact disabled. Thus, the issue before this court is not whether [Hughes] is disabled, but rather, whether the ALJ's findings were supported by substantial evidence.

"Substantial evidence may be something less than the greater weight or preponderance of the evidence" (*Young v. Secretary of HHS,* 957 F.2d 386, 389 (7th Cir.1992)), and a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion (*Delgado v. Bowen,* 782 F.2d 79, 83 (7th Cir.1986) (per curiam)).

Hughes contends that reversal or remand is in order because the ALJ's decision is not supported by substantial evidence. More specifically, he charges that the ALJ:

1. failed to comply with SSR 83–20 when he ignored the medical evidence submitted after the Hearing and

2. inappropriately disregarded Dr. Kerr's conclusion that Hughes suffered from mental impairments that would prevent him from engaging in gainful employment.

Those contentions will be addressed in turn.

### Supplemental Medical Evidence

Hughes first claims that the ALJ failed to comply with the SSR 83–20 directive that medical evidence should constitute the "primary element" of onset determinations (1983 *Social Security Rulings* 109, 110 (Dep't Health & Human Services)). ALJ Sprague therefore erred, Hughes argues, in ignoring a significant body of medical evidence submitted after the Hearing (R. 217–40)[15]—evidence that established that Hughes had indeed been treated for his physical impairments during a time period that the ALJ had deemed crucial in determining the point at which Hughes became unable to function as an assembler (see R. 17, 19).[16]

---

15. Hughes' counsel represented in a letter to the ALJ that she was able to obtain the additional evidence only after learning that Dr. Kaplan had sold his practice to another physician (R. 214).

16. ALJ Sprague posed the correct question: at what point in time Hughes' capabilities fell below those required by his past relevant work (*Strittmatter v. Schweiker,* 729 F.2d 507, 509 (7th Cir.1984)). Hughes' quarrel is with the ALJ's answer, not the question.

On February 14, 1994 (over 3 months after the Hearing) Hughes' counsel sent ALJ Sprague a 3-page cover letter and 23 pages of supplemental medical records extending from December 22, 1990 to December 18, 1993 (R. 214–40).[17] ALJ Sprague had specifically informed counsel that additional medical evidence "would be appreciated" (R. 88) and, if forthcoming, would necessarily be considered in reaching a decision.[18] Yet when he later issued his decision he never referred to those submissions (R. 14–22). Quite to the contrary, his opinion's only comment as to evidence relating to the time period that was later covered by the additional evidence said that Hughes had *orally* "admitted during the hearing that he received little treatment between March, 1991 and August, 1992" (R. 19) (compare *Bates v. Sullivan*, No. 88 C 7134, 1989 WL 68517, at *4, 1989 U.S.Dist. LEXIS 7725, at *11 (N.D.Ill. June 15)). And there is no doubt that the ALJ had some critical facts dead wrong in consequence of that—his opinion contained this critical error, mixing a flat-out error with a partial truth to lead to a problematic conclusion (R. 17):

**17.** While no legible signature can be made out anywhere in the additional medical records, and while the handwriting appearing in the last 6 entries in Hughes' file is very different from that appearing in the prior entries (R. 224–26), everyone involved—Commissioner, Hughes and the Appeals Council (D.Mem. 4 n. 7, R. 214 & R. 6, respectively)—has assumed that *all* of the additional records are those of Dr. Kaplan. This opinion therefore proceeds on the same premise.

**18.** Evidence may be submitted to an ALJ following a hearing (see Reg. § 404.944; *Pitts v. Sullivan*, 923 F.2d 561, 565 (7th Cir.1991)). After saying that he would "appreciate" such additional evidence, the ALJ went on to inform Hughes (R. 89):

I will not be able to decide your case, s (sic) your attorney will tell you, until I receive all the evidence....

**19.** [Footnote by this Court] Later (R. 19) the ALJ modified that to Hughes' having received "little" medical treatment between those dates. But whatever the reason for the somewhat different locution, it too was said in ignorance of the actual fact of Hughes' continuous ongoing treatment based on his arthritic and muscle spasm conditions and his persistent pain.

**20.** There is no question that the additional evidence complied with the requirement that it relate to a period "on or before the date of the

He did not have any medical treatment from March, 1991 to August, 1992.[19]

Hughes claims error on that score, asserting that "the ALJ completely ignored the post-hearing evidence" (P.Mem. 9). And Commissioner *concedes* that the ALJ never reviewed those documents (D.Mem. 4 n. 7). Indeed, the Appeals Council refers to the supplemental evidence as "new" without further explanation (R. 6).[20]

Nothing in the record explains *why* the ALJ did not review evidence that he had previously (and accurately) suggested could be material and whose "absence" he specifically highlighted in the course of reaching his decision.[21] But the reason is really irrelevant. This is not at all the kind of situation as to which "the ALJ was not required to discuss every piece of evidence, and the weight to be given to this evidence remained within the discretion of the ALJ" (*Diaz*, 55 F.3d at 308). Instead what is critical is that ALJ Sprague was playing with less than what he himself had characterized as needed to make up a full deck.[22]

administrative law judge hearing decision" (Reg. § 404.970(b)).

**21.** This Court is not of course suggesting any *deliberate* misconduct on the ALJ's part. There are several possible explanations for what occurred, such as misrouting within the Social Security offices or misfiling of the documents. Hughes R. Mem. 2 speculates that "it is more likely (assuming the ALJ did not merely ignore the evidence) that the evidence was received at the Office of Hearings and Appeals but not associated with Plaintiff's file," going on to comment (*id.* n. 1):

It has been counsel's experience that such mishaps occur with alarming frequency.

This Court need not indulge such speculation—what controls is the ALJ's unquestioned failure to consider important evidence, not how and why that came about.

**22.** Unlike a judge presiding over a trial, an ALJ has an affirmative duty to develop a full and fair record (*Andrews v. Bowen*, 848 F.2d 98, 101 (7th Cir.1988)). Hence the ALJ must act as examiner to develop the facts thoroughly (*Thompson v. Sullivan*, 933 F.2d 581, 586 (7th Cir.1991)). Reg. § 404.944 requires the ALJ to look "fully into the issues" and "receive into evidence any documents that are material to the issues." If the ALJ believes that available evidence has not been provided, he may adjourn the hearing (Reg. § 404.944; see *Luna v. Shalala*, 22 F.3d 687,

■ It is true that the Appeals Council said that *it* had considered the additional medical evidence and found that "it does not warrant a change in the Administrative Law Judge's decision," which it said "is supported by the weight of the evidence" (R. 7). But that impermissibly erases the distinction between the factfinder (in this instance the ALJ) and a reviewing tribunal. Every litigant is entitled to have the *factfinder* weigh the evidence in the first instance, after which the reviewing court or agency properly applies a level of review that is more solicitous of the original decision than de novo review. It is no different than if this Court were to conduct a bench trial and decide the case while wholly ignoring a material part of the evidence before it—in that event the Court of Appeals plainly would (and should) remand the case so that the parties would receive the type of fair trial (meaning in that instance one based on *all* the evidence) that had not been accorded them.

To be sure, a key aspect of what has just been said has been its reference to "ignoring a *material* part of the evidence." If it is plain that the overlooked evidence could not have altered the result, the factfinder's error in failing to consider it would of course be harmless, and a remand would be pointless. But in that respect the reviewing body—whether the Appeals Council or this Court—must respect the characterization that the ALJ himself had placed upon the type of evidence involved. Again it should be remembered that because the Appeals Council denied review, it is the *ALJ*'s decision that has become Commissioner's final decision and is now under review (*Diaz*, 55 F.3d at 305 n. 1). So this opinion turns to the question of materiality. And in that respect this Court must determine as a matter of first impression whether there is a "reasonable possibility" that the additional evidence sub-

mitted by Hughes would have changed the outcome of the Hearing (*Nelson v. Bowen*, 855 F.2d 503, 506 (7th Cir.1988)).

Here is what ALJ Sprague said in pertinent part when determining the onset date of Hughes' disability (R. 19): '

> After a careful consideration of all the evidence in this case, I find that the claimant has failed to sustain his burden of proof. This is especially so in relation to his light job as assembler of light airplane parts. Usually, he lifted items weighing less than 10 pounds. He only occasionally had to lift items weighing up to 30 pounds. It seems that his impairments did not get severe enough to be unable to perform this work until about October, 1992. This is when the claimant's arthritis, and pain, got very severe.

> The claimant admitted at the hearing that he received little medical treatment between March, 1991 and August, 1992. He said his condition didn't get real bad until about one year ago. He could get around better before that.

> Dr. Trafimow performed a consultative orthopedic examination on the claimant on July 23, 1992. In conclusion, he stated: "I am unable to find any objective evidence of the reasons for the claimant's pain." (Exhibit 25, p. 4).

Thus the ALJ cited three factors in support of his decision: (1) Hughes' statement that his condition had worsened about one year before the Hearing, (2) the absence of medical treatment from March 1991 to August 1992 and (3) the July 23, 1992 examination performed by Dr. Trafimow.

This Court's de novo review of the materiality issue (*Nelson*, 855 F.2d at 506) leads it to an entirely different conclusion from that reached by the Appeals Council.[23] As to

---

692–93 (7th Cir.1994)). Nevertheless, while a remand is appropriate if the ALJ fails to develop the record fully, this Court must respect the authority of the ALJ to decide how much evidence is enough (*Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir.1993)). Here ALJ Sprague reached no such decision that the added evidence was not needed—instead he had said quite the opposite.

**23.** Though not controlling in light of this Court's obligation to take a fresh look at the question, it must be said that the Appeals Council's statement sounds as though it were improperly making its own evaluation rather than deciding whether there was a reasonable possibility that the evidence might have changed the *ALJ*'s decision (R. 6–7). That approach would have been improper for this Court to take, and it would be no more appropriate for the Appeals Council.

Hughes' condition of health from March 1991 to August 1992 (which was a stated cornerstone of the ALJ's decision to reject Hughes' asserted onset date), it is clear that the additional evidence might well have rebutted the ALJ's impression that Hughes must have been "doing pretty good during that period" (R. 64) because there was no apparent need for medical treatment. Though the actual evaluation of the added evidence will be for the ALJ to make, a brief recital is in order to demonstrate its materiality in the "reasonable possibility" sense.

Although the copies of the supplemental records provided to this Court by the United States Attorney as part of the administrative record pose some real problems in reading the doctor's handwriting,[24] they plainly report "persistent pain" and "severe spasms" suffered by Hughes dating back to January 29 and March 6, 1991 (R. 219) and continuing thereafter (see R. 220–22). Relatedly the August 1991 CT scan revealed mild bulging between some discs in Hughes' spine, mild soft tissue and bony stenosis (R. 234). That CT scan also prompted the examiner to note that further evaluation might be necessary if there was "clinical suspicion for a herniated disc" (id.). In November 1991 Hughes again complained of lower back pain with sciatica— a condition usually associated with a herniated lumbar disc (Stedman's Medical Dictionary 1262 (5th unabridged lawyer's ed. 1982)). Those observations are entirely consistent with Dr. Sawlani's earlier view on December 12, 1990 that a narrowing of the disc space between L5–S1 could not be ruled out (R. 125)—"[g]reater than 90% of herniated discs of the lumbosacral spine occur at L4–5 or L5–S1" (6 Lawyers' Medical Cy-

clopedia § 44A.37, at 738)—and with Dr. Kaplan's March 6, 1991 finding of a positive straight-leg raising at 30°[25] (R. 128) (id.).

Neither this Court nor the Appeals Council may properly engage in its own initial evaluation as to the weight to be given the additional records—that is for the ALJ to do. Surely those records are both relevant and material to a decision regarding Hughes' condition during the critical time period cited by the ALJ himself. SSR 83–20 provides that a claimant's asserted onset date controls if supported by such records, and SSR 88–13 directs the ALJ to investigate records of pain medication and treatment when evaluating the evidence of the claimant's pain (see R. 18). It will be recalled that the only other evidence cited by the ALJ when fixing the onset date was one ambiguous statement by Hughes himself[26] and one conflicting medical report (see Appendix). It is an understatement to say that there is a "reasonable possibility" that the additional evidence would have tipped the balance in Hughes' favor.

■ In sum, this Court finds that the additional records are plainly material to the issue of Hughes' onset date, and as said in Nelson, 855 F.2d at 507–08 (adapted to this case):

> Given the paucity of the evidence before the ALJ relevant to this issue and the lack of evidence clearly contradicting the additional evidence offered by [Hughes] before the Appeals Council, that evidence, if considered by the ALJ, might reasonably have affected his determination....

That requires a remand to Commissioner for consideration of the additional evidence (and because the situation does not qualify as a

---

**24.** On June 30, 1995 this Court's law clerk requested that plaintiff's counsel furnish additional copies of the supplemental evidence in the hope that such copies would be clearer. They were not. Marshall v. Schweiker, 688 F.2d 55, 56 (8th Cir.1982) (per curiam) expresses the sense of frustration that sort of thing may generate. See also Honorable Gerald Heaney, Why the High Rate of Reversals in Social Security Disability Cases?, 7 Hamline L.Rev. 1, 15 (1984).

**25.** As used in that context, the term "positive" refers to the manifestation of pain (Principles of Ambulatory Medicine 872 (L. Randol Barker et al. eds., 4th ed. 1995)).

**26.** Though this is not a case in which the ALJ "simply led [claimant] to the statement" (Thompson, 933 F.2d at 586), Hughes' testimony is hardly as compelling as the ALJ believed it to be. Hughes merely stated that his conditions "got real bad last year" (R. 63), with little elaboration on his physical capabilities before that time. Furthermore, the ALJ noted that Hughes "could get around better before that" (R. 19), but Hughes had stated at the Hearing (R. 64, emphasis added):

> I could get around a little bit better [before July 1992] but now, I don't, I don't hardly get around none....

"sentence six" remand under Section 405(g), it is perforce a "sentence four" remand (*Shalala v. Schaefer*, — U.S. —, —, 113 S.Ct. 2625, 2629, 125 L.Ed.2d 239 (1993); *Melkonyan v. Sullivan*, 501 U.S. 89, 99, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991)).

### Hughes' Claimed Mental Impairment

Hughes also claims (P.Mem. 14):

> While Plaintiff's personality disorder may not be manifested at listings level severity, the ALJ nevertheless erred in accepting Dr. Blackman's unsupported assertions as evidence that Plaintiff had no mental limitations on his ability to engage in substantial gainful employment.

Citing *Garrison v. Heckler*, 765 F.2d 710, 713 (7th Cir.1985) for the proposition that a consulting expert cannot supply substantial evidence simply by contradicting another expert's findings (P Mem. 13), Hughes predictably argues that Dr. Kerr's report should have trumped Dr. Blackman's testimony. But that argument is both tardy and unpersuasive here.

As an initial matter, Hughes really waived the argument that the ALJ erred in assessing Hughes' mental impairment. Hughes' petition to the Appeals Council makes no mention of his claimed mental impairments, much less any claim that the ALJ improperly credited Dr. Blackman's testimony over that of Dr. Kerr (R. 211–12). *Papendick v. Sullivan*, 969 F.2d 298, 302 (7th Cir.1992) reconfirms the principle that issues sought to be raised on appeal to a federal court must first have been raised administratively. This Court could therefore properly "decline to consider issues not considered by the Appeals Council" (*id*). But because the United States Attorney has addressed the merits of Hughes' mental impairment argument without asserting waiver, the waiver issue may itself be waived (cf. *Barrera v. Young*, 794 F.2d 1264, 1269 (7th Cir.1986)), so this Court will likewise consider Hughes' claim.

■ Commissioner has promulgated a Listing of Mental Impairments that, if properly shown by a claimant, presumptively establish that the claimant is disabled and is thus entitled to receive benefits (Reg.Pt. 404, Subpt. P, App. 1, §§ 12.00–12.09; *Young*, 957

F.2d at 389). For a claimant to qualify, the Regulations generally require: (1) documentation of any medically determinable mental impairments (the "A" criteria) that if satisfied leads to (2) an assessment of functional limitations that those impairments impose on the claimant's activities (the "B" criteria).

At the Hearing, Hughes submitted as evidence of his mental impairment Dr. Kerr's psychological evaluation suggesting that Hughes met the requirements of two listings: 12.08 (Personality Disorder) and 12.09 (Substance Addiction Disorder) (R. 164). But during the Hearing the ALJ observed that while "Kerr says [Hughes] meets 12.08[ ] he didn't check enough boxes on that" (R. 87)—that is, Dr. Kerr had failed to indicate three functional limitations of the severity required by paragraph B in listing 12.08 (see R. 19, 170; Reg.Pt. 404, Subpt. P, App. 1, § 12.08). Hughes' counsel conceded the point, stating (R. 88):

> Right. Right, as I said, I didn't present this as a case where he meets the listing.

Then the ALJ went on to conclude that Hughes also failed to meet the requirements of listing 12.09 because the "claimant's substance abuse is in good remission, and no longer causes any limitations" (R. 19).

But Hughes correctly asserts that his failure to meet the listing requirements under sections 12.08 and 12.09 does not end the inquiry, for his mental impairment might still have been so severe as to hinder his gainful employment. As *Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir.1991) teaches:

> Pursuant to Congress' mandate, the Secretary must consider the combined effects of impairments that may not be severe individually, but which in combination may constitute a severe medical disability. 42 U.S.C. § 423(d)(2)(C) (1988). The Secretary's regulations indicate that "[t]he determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled but the impairment is nevertheless severe." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(A). The Secretary, pursuant to

his own regulations, cannot therefore dismiss a claimant's mental impairment once there is a finding that the claimant does not meet the listings. A claimant's mental impairment must also be evaluated in combination with the effects of other impairments.

■ ALJ Sprague did precisely that (R. 19). After finding the listings inapplicable, the ALJ *did* go on to consider whether Hughes suffered from a mental impairment that might impede his ability to work. ALJ Sprague found no such impairment—only an inability to process "complex tasks from a mental point of view." It was unnecessary for the ALJ to consider how Hughes' mental shortcomings might interact with other impairments—*Hargis* and Reg. Part 404, Subpt. P, App. 1, § 12.00(A) require that course to be pursued only when an impairment is "severe."[27]

■ That leaves as final question whether the test results cited and interpreted by Dr. Blackman, and referred to by the ALJ (R. 19), amount to substantial evidence of Hughes' ability to work. Hughes cites *Garrison*, 765 F.2d at 713 in support of his contention that the ALJ was wrong to reject Dr. Kerr's "careful, thoughtful analysis" (P.Mem. 13), arguing that those conclusions were based upon an in-depth interview and testing while Dr. Blackman's conclusions amounted to "unsupported assertions" (*id.* 14).

Hughes' problem is that *Garrison* does indeed control, but that it requires affirmance of the ALJ's decision as to Hughes' claimed mental impairment. Here is what *Garrison*, 765 F.2d at 713 says:

Allen [v. Weinberger, 552 F.2d 781 (7th Cir.1977)] and Whitney [v. Schweiker, 695 F.2d 784 (7th Cir.1982)] stand in some tension with [Richardson v.] Perales [, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)]. We hesitate to extend them. At all events, neither case holds that consult-

ing physicians' reports are not "substantial evidence" when the consulting physician brings to the case something of value to the administrative decision, such as greater expertise with an ailment, greater impartiality, or a greater range of experience that facilitates a comparison of one case against a standard or rule of decision.

And *id.* at 715:

The preference for the views of the treating physician discussed in *Allen* and *Whitney* applies only when ability to observe the claimant over an extended period is essential to an accurate understanding.

Unlike the situation as to Hughes' back problems (see Appendix), Hughes is scarcely in a position to urge that the "ability to observe the claimant over an extended period [was] essential to an accurate understanding" of his mental condition. After all, Hughes contends that Dr. Kerr's findings should control, yet the record contains evidence of only a single visit to Dr. Kerr on June 19, 1992 (R. 155, 164). Furthermore, while Hughes complains that Dr. Blackman's reasoning was cryptic or even non-existent (P.Mem. 14), that misconceives Dr. Blackman's role. Dr. Blackman was retained only to interpret Dr. Kerr's data—it was therefore to be expected that he would provide "conclusions rather than reasons" (*Garrison*, 765 F.2d at 712). In fact, Hughes' argument accepts as its premise that this is a case much like *Garrison* to the extent that Hughes' mental condition "is subject to reasonably precise measurements" (*id.* at 714): Dr. Kerr assessed Hughes' condition by way of the Wechsler Memory Scale (in part), Psychiatric Report Form DF–104, Bender Gestalt Test, Wechsler Adult Intelligence Scale–Revised, Wide Range Achievement Test for reading and the Cornell Psychiatric Index (R. 156–58; P.Mem. 13 n. 11). Those tests are precisely the kind of data reviewed by consulting experts. And as *Garrison*, 765 F.2d at 714 teaches:

---

**27.** Even though a vocational expert might have provided supplemental testimony as to Hughes' potential employment in light of his claimed impairments, "[t]he decision whether to employ the services of a vocational expert is entirely within the discretion of the ALJ" (*Binion v. Shalala*, 13

F.3d 243, 246 (7th Cir.1994), quoting *Ehrhart v. Secretary of HHS*, 969 F.2d 534, 540 (7th Cir. 1992)). Here the ALJ may have felt comfortable in relying upon the vocational assessment in the record (R. 113).

Unless the claimant establishes that the specialists misread or misunderstood the results of the test, or that the objective tests do not accurately describe the impairment, the consulting physicians' reports may supply substantial evidence for the agency's finding.

Thus confronted with the raw data gathered by Dr. Kerr and the opposing interpretations of that data by Dr. Kerr and Dr. Blackman, the ALJ simply agreed with the latter (R. 19), thus fulfilling his duty to resolve conflicting medical evidence (see *Diaz*, 55 F.3d at 306 n. 2). In light of the recited reliance by both Dr. Blackman and the ALJ on the very tests that Hughes champions (R. 81 and 19–20), the ALJ's finding as to Hughes' mental competence was supported by substantial evidence. That issue calls neither for reversal nor for reconsideration on the required remand.

### Conclusion

Hughes contends and Commissioner concedes that the ALJ never reviewed the additional medical evidence that was submitted after the Hearing. This Court finds that evidence was plainly material, for what ALJ Sprague incorrectly labeled as its absence was a key element of the ALJ's decision to deny Hughes disability benefits. However, Hughes' further contention that the ALJ erred in discrediting the testimony of Dr. Kerr is without merit. Accordingly, each litigant's motion for summary judgment is denied, and this action is remanded to Commissioner for further action consistent with this opinion (including the Appendix). Commissioner's decision is reversed.[28]

### APPENDIX

Although Hughes has pointed only to the additional evidence submitted after the Hearing and to the evidence of his mental impairment, another shortcoming of the ALJ's decision merits attention on remand. ALJ Sprague's opinion failed to comment at all on *any* of the evidence in the record tending to support Hughes' asserted onset date. This

Court (*Oyen v. Shalala*, 865 F.Supp. 497, 507 (N.D.Ill.1994)) has echoed the teaching of our Court of Appeals that it is the duty of every ALJ "to explain the basis of his or decision with particularity." *Herron*, 19 F.3d at 333 (citations omitted) reconfirms that duty:

Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence. Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ "must articulate at some minimal level his analysis of the evidence."

It is therefore a matter of concern that the ALJ chose not to comment on such items as (1) the December 12, 1990 x-ray that demonstrated "degenerative changes" in Hughes' spine "with osteophyte formation" and a "marked narrowing" of disc spaces (R. 125), (2) Dr. Kaplan's admonition that Hughes not return to work due to "arthritis in the lumbo-sacral spine, feet, etc." (R. 124) and (3) Dr. Kaplan's March 6, 1991, finding that Hughes suffered from osteo-arthritis, degenerative changes and muscle spasms in his paraspinal muscles (R. 126). Even more troublesome is the ALJ's total silence as to Dr. Steward's May 2, 1992 examination of Hughes—an examination in which Hughes was found incapable of working an 8–hour day (R. 150), as is required even for sedentary work (see *Sample v. Shalala*, 999 F.2d 1138, 1142 n. 6 (7th Cir.1993)).

In that latter respect, even though the ALJ's reliance on Dr. Trafimow's July 23, 1992 findings may perhaps be viewed as an implicit rejection of the findings of Dr. Steward, any such practice raises "considerable difficulties for a reviewing court" (Judge Heaney, 7 Hamline L.Rev. at 15). In that regard the ALJ not only failed to give "good reasons" for discounting or rejecting the

---

**28.** As is taught in *Melkonyan*, 501 U.S. at 102, 111 S.Ct. at 2165 and reconfirmed in *Schaefer*, —— U.S. at ——–——, 113 S.Ct. at 2629–32, this

is a final judgment that starts the time clock for Hughes' attorney's fee application.

opinion of a "treating source" as required by Reg. § 404.1527(d)(2), but he also favored the opinion of a physician who had examined Hughes only once, even though "[s]erial observation [such as that conducted by Dr. Steward] is very important in management of patients with back pain" (*Principles of Ambulatory Medicine* 875). Furthermore, both (1) the ALJ's reliance on Dr. Trafimow's failure to find "any objective evidence" of pain (R. 19) and (2) the ALJ's emphasis on the "fact" that it was only since October 1, 1992 that "many of the claimant's complaints have been supported by the medical evidence" (R. 20)[1] appear to be at odds with the revised version of Reg. § 404.1529(c)(2) (see *Knight*, 55 F.3d at 313–14 and cases cited there).

Because it has proved necessary to remand this case in any event, there is no need to decide whether those deficiencies in the ALJ's original decision would themselves have rendered it vulnerable under the "substantial evidence" standard. Instead the ALJ can cure those problems on remand.

---

1. As the lengthy discussion in the text of this opinion has demonstrated, that *"fact"* is in fact a non-fact. But the point made here is a different one: what appears to be an error in insisting on *objective medical evidence as a precondition to* finding the existence of subjective disabling pain.